# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01602-REB

RCR FARMS, LLC,

      Plaintiff,

v.

FEDERAL CROP INSURANCE CORPORATION,

      Defendant.

---

## PLAINTIFF'S OPENING BRIEF

---

Jeff L. Todd
Jeremiah L. Buettner
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102-7103
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
Email: jeff.todd@mcafeetaft.com
        jeremiah.buettner@mcafeetaft.com

December 28, 2020

## TABLE OF CONTENTS

Page

STATEMENT OF RECORD FACTS ........................................................................................1

STANDARD OF REVIEW ...................................................................................................13

ARGUMENT AND AUTHORITY ..........................................................................................14

I.  THE GFP DETERMINATION IS ARBITRARY AND CAPRICIOUS BECAUSE IT FAILS
TO ANALYZE WHETHER RCR FARMS EMPLOYED GFP FOR THE 2018 CORN ACRES ON
A UNIT-BY-UNIT BASIS AS REQUIRED BY THE 2018 POLICY ...................................................14

II.  THE SEED POPULATION DETERMINATION IS ARBITRARY AND CAPRICIOUS BECAUSE
IT APPLIES AN IMPROPER STANDARD FOR DETERMINING WHETHER THE REDUCED
SEEDING RATES EMPLOYED BY RCR FARMS FOR THE 2018 CORN ACRES WERE
CONSISTENT WITH GFP ...................................................................................................19

III.  THE WEED CONTROL DETERMINATION IS ARBITRARY AND CAPRICIOUS BECAUSE IT
IS BASED ON PHOTOGRAPHS TAKEN WEEKS AFTER RCR FARMS SUBMITTED ITS NOTICE
OF LOSS FOR THE 2018 CORN ACRES THAT DO NOT PROVIDE INFORMATION REGARDING
THE DATE/TIME TAKEN, UNIT NUMBER, LOCATION, AND SUBJECT MATTER DEPICTED .........24

CONCLUSION.................................................................................................................27

## **<u>TABLE OF AUTHORITIES</u>**

<u>Cases</u>

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ...............................................................17

*American Paper Institute v. Train*, 543 F.2d 328 (D.C. Cir. 1976)..................................13

*Ohio v. Ruckelshaus*, 776 F.2d 133 (6th Cir. 1985) .......................................................13

*United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969)..................................................17

*Wilkinson v. Legal Servs. Corp.*, 27 F.Supp.2d 32 (D.D.C. 1998) .................................17

<u>Federal Regulations and Statutes</u>

7 C.F.R. Part 400 .............................................................................................................2

7 C.F.R. § 400.55.............................................................................................................2

7 C.F.R. § 457.8...............................................................................................................2

5 U.S.C. § 706.................................................................................................................13

7 U.S.C. §§ 1501 *et seq.* ....................................................................................1, 13, 14

Plaintiff, RCR Farms, LLC ("RCR Farms"), submits the following Opening Brief in the above-styled action for judicial review of the Good Farming Practice ("GFP") determination (the "GFP Determination") made by Defendant, the Federal Crop Insurance Corporation ("FCIC"), through the Risk Management Agency ("RMA"), its administering agency, with respect to RCR Farms' 2018 corn crop in Bent County, Colorado.

## STATEMENT OF RECORD FACTS

The underlying basis for RCR Farms' claim for judicial review of the GFP Determination has been set forth in RCR Farms' Complaint (Dkt. No. 1). The Administrative Record in this case establishes the following facts:

1. **The Federal Crop Insurance Program.** Pursuant to the Federal Crop Insurance Act (the "FCIA"), 7 U.S.C. §§ 1501-1524, FCIC and RMA administer and regulate the federal crop insurance program, whereby RMA drafts various crop insurance policies for sale through private approved insurance providers ("AIPs"), and FCIC provides reinsurance on those policies. (*See generally*, Common Crop Insurance Policy, AR 1-44).

2. **MPCI Policies of Insurance.** This action concerns RMA-designed Multiple Peril Crop Insurance ("MPCI") policies of insurance. MPCI policies base their premiums, insurance guaranty, and indemnity on a producer's historical yields. (Common Crop Insurance Policy, AR 1-44). An MPCI policy insures a producer from yield losses resulting from natural causes (e.g., drought) using the producer's actual production history ("APH") as a baseline. A producer's APH is set forth in a database of a minimum of four and a maximum of ten years' yields and is updated each crop year. The database contains the producer's actual yields, except for certain scenarios where there are fewer than four years' worth of yields. The APH yield is the simply average of the

1

actual yields in the producer's APH history. (*See* Common Crop Insurance Policy, AR 1-44; 7 C.F.R. Part 400, 7 C.F.R. § 400.55(b)(5)).

　　　　3.　　**MPCI Good Farming Practices Requirement.** The MPCI Policy does not insure losses caused by a producer's "[f]ailure to follow recognized good farming practices for the insured crop." (Common Crop Insurance Policy, § 12(b), at AR 22). The MPCI Policy defines good farming practices as:

> The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance . . . which are those generally recognized by agricultural experts . . . for the area.

(Common Crop Insurance Policy, § 1, at AR 5; Common Crop Insurance Policy, codified at 7 C.F.R. § 457.8; Good Farming Practice Determination Standards Handbook (the "GFP Handbook"), at AR 84). RMA has established a procedure for the review of good farming practices and issuance of good farming practices determinations, which has been published in FCIC Manager's Bulletin MGR-05-010 (the "GFP Bulletin"),[1] the GFP Handbook, and the Loss Adjustment Manual Standards Handbook (the "LAM").[2]

　　　　4.　　**RCR Farms' Purchase of the MCPI Policy.** RCR Farms farms land in Bent County, Colorado. RCR Farms planted approximately 2,500 acres of irrigated corn (among other things) for the 2018 crop year (the "2018 Corn Acres"). RCR Farms insured the 2018 Corn Acres with an MPCI policy with a Revenue Protection endorsement (the "2018 Policy"), which it purchased from NAU Country Insurance Company ("NAU"). (*See* Policy Transfer/Application, Multiple Peril Crop Insurance, AR 2839-2842; Policy Holder Report, AR 2847).

---

[1] Available at https://legacy.rma.usda.gov/news/managers/2005/PDF/mgr-05-010.pdf.
[2] Available at https://www.rma.usda.gov/-/media/RMA/Handbooks/Loss-Adjustment-Standards---25000/Loss-Adjustment-Manual/2018-25010-2H-Loss-Adjustment-Manual.ashx.

5.     RCR Farms considered several factors to determine the optimal seeding rate for each unit in the 2018 Corn Acres. RCR Farms considered the below-average snow pack and canal storage levels for the 2018 Corn Acres, as well as the soil profile of each unit in the 2018 Corn Acres. RCR Farms also relied on the professional opinion of Crop Quest—RCR Farms' agronomy consultant—which performed an in-depth evaluation of the soil profile, geography, and history of each unit in the 2018 Corn Acres to determine the optimal seed variety and seeding rates for each unit. While RCR Farms' soil profiles were good, justifying planting all of the 2018 Corn Acres, RCR Farms determined that it should reduce the seeding rate for the 2018 Corn Acres due to the significant water limitations indicated by the below-average snow pack and canal storage levels. (*See* Crop Quest Letter, AR 287; Fort Lyon Canal Company Letter, AR 514; Arkansas Basin Snow Pack Report, AR 523-525; Valley Ag Consulting Letter, AR 290-292; U.S. Drought Monitor, Colorado (April 17, 2018), AR 1095; U.S. Drought Monitor, Colorado (May 1, 2018), AR 1096). By reducing its seeding rate, RCR Farms would allow more water to be utilized per plant for the 2018 Corn Acres. The seeding rates employed by RCR Farms for the 2018 acres varied from unit to unit, and even within units, based on the unique characteristics of each unit. And, while the seeding rates were lower than in years past, they still provided for a target yield above the yield used to determine the production guarantee for the 2018 Corn Acres—as required by the GFP mandate. (*See* Crop Quest Letter, AR 287; RCR Farms Reconsideration Request Letter, AR 1494-1499; Tabs 7-16 to RCR Farms Reconsideration Request Letter, AR 1718-1754). RCR Farms also pre-irrigated the units in the 2018 Corn Acres in advance of planting to assist the germination of the seeds being planted. (RCR Farms Reconsideration Request Letter, at AR 1496).

6.     **Agricultural Experts Recognize the Use of Low-Density Seeding Rates for Water-Limited Areas**. The use of low-density seeding rates in response to water limitations is a farming practice recognized by agricultural experts. For example, Andy Heggenstaller—the Head of Agronomy, US Seeds, for Syngenta[3]—has stated that:

> Syngenta research indicates that lower planting populations are generally more suitable for water-limited locations, while higher planting populations are more desirable for fully irrigated and non-water limited locations.

(Syngenta Seeding Rate Letter, AR 1501). The use of low-density seeding rates has also been acknowledged by Gary Hergert, former Extension Soils Specialist for the University of Nebraska Panhandle Research and Extension Center. (*See* Corn Populations and Deficit Irrigation in Western Nebraska, AR 583-586).

7.     **RMA Acknowledges the 2018 Corn Acres Faced Water Limitations**. RMA—through its Topeka Regional Office (the "TRO")—recognized that the 2018 Corn Acres experienced significant water limitations, stating that: "[s]upporting documentation asserts that not only would your water be reduced by the canal company, but the area was in a D2-D3 drought during the planting window." (RMA GFP Determination Letter, AR 1097-1105).

8.     **RCR Farms' Weed Control Practices**. In addition to its painstaking efforts to determine optimal seeding rates for the 2018 Corn Acres, RCR Farms also implemented weed control practices consistent with GFP. RCR Farms utilized a pre-emergent weed control measure of spraying Roundup (32 oz/acre), Banville (6-8 ounces/acre, although this decreases depending on proximity to planting) and Atrazine (2 pints/acre). RCR Farms does not keep individual spray

---

[3] Syngenta is one of the largest companies in the global seed industry and owns the "Golden Harvest" brand of seeds utilized by RCR Farms for the 2018 Corn Acres.

records, but this is consistent with the records RCR Farms provided to RMA. (*See* RCR Farms Reconsideration Request Letter, at AR 1496; Herbicide Invoices, AR 275-279; RCR Farms Herbicide Treatment Letter, AR 1372).

9.      **RCR Farms Plants the 2018 Corn Acres.** RCR Farms planted the 2018 Corn Acres in May 2018. (See RMA GFP Determination Letter, at AR 1098). Unfortunately, drought conditions, hot wind, and irrigation supply were much worse than RCR Farms expected. Even planting into pre-irrigated acreage became problematic because, due to the heat and the wind, the evaporation rates meant that the soil dried out so fast that either (a) the seed would not germinate or (b) the seed would germinate but desiccate before the roots could grow (i.e., the roots could not grow fast enough to keep up with moisture depletion). In June of 2018, there was over 14 inches of evapotranspiration, compared with only about ¼ inches of rain and six-inches of flood irrigation. Even if RCR Farms had irrigated every acre twice, it would not have been able to keep pace with the evaporation during this time period. (*See* RCR Farms LLC Special Report, AR 415-416; Crop Quest Letter, AR 287; Valley AG Consulting Letter, AR 290-292; RCR Farms Reconsideration Request Letter, at AR 1496).

10.      **Failure of RCR Farms' 2018 Corn Crop.** By June 2018, there were large areas in the 2018 Corn Acres where no plants came up at all. In other areas, plants did emerge but generated extremely poor stands. There was also substantial plant death in the areas where plants did emerge. These conditions are reflected in the photographs taken by the NAU Adjusters during their August 1, 2018 inspection of the 2018 Corn Acres. (*See* NAU Photographs of 2018 Corn Acres, at AR 587-599). Nevertheless, for the areas with emergent corn, RCR Farms utilized Armezon, Roundup, and Atrazaine to control weed growth. (*See* RCR Farms Reconsideration

Request Letter, AR 1494-1499; Herbicide Invoices, AR 275-279; RCR Farms Herbicide Treatment Letter, AR 1372).

11.     **RCR Farms' Notice of Loss for the 2018 Corn Acres.** RCR Farms reviewed the 2018 Corn Acres in July 2018 and, seeing no improvement from June 2018, concluded the corn crop on the 2018 Corn Acres was not going to make it to maturity. The delay in sprouting and slow growth meant that there were not going to be enough "growing degree" days before the average freeze time frame. Even the areas with some emergence were not harvestable. Essentially, as of this time (and, in fact, quite earlier), there was no "crop" to care for. At this point, RCR Farms directed its crop insurance agent to file a Notice of Loss, which occurred on or about July 23, 2018. (*See* RCR Farms LLC Special Report, at AR 415-416; NAU Photographs of 2018 Corn Acres, at AR 587-599; RCR Farms Notice of Loss, AR 247).

12.     **NAU Adjusters Inspect the 2018 Corn Acres on August 1, 2018.** About a week after RCR Farms filed the Notice of Loss, NAU adjusters visited the 2018 Corn Acres to inspect the fields. NAU's adjusters agreed that the failure of the corn crop on the 2018 Corn Acres was caused by heat and wind, and that this was common for the area where the 2018 Corn Acres were located. (RCR Farms LLC Special Report, at AR 415). In the RCR Farms LLC Special Report, the chief NAU adjuster for RCR Farms 2018 loss claim stated:

> The weather did not cooperate as it stayed dry and they had hot dry winds in June and the early part of July, see Exhibit 1 and 8, causing some fields of corn not to sprout and stressing other fields of corn.

(*See* RCR Farms LLC Special Report, at AR 415-416). While the NAU adjusters did notice some weeds, including "some fields" with weed pressure, they ultimately determined that this was not due to RCR Farms' failure to follow good farming practices, but was rather caused by an insurable cause of loss:

6

> The chemicals used to control these weeds and grasses have to be incorporated for them to work. Rainfall is needed to incorporate these chemicals. **Because of the lack of rain**, he had to rely on the flood irrigation to incorporate the chemicals and that does not work well. **With the hot dry winds causing the weeds and grasses to shut down** the intake of substances through the leaves the chemicals do not work well, see Exhibit 10. By the time he received some rain in late July, the corn was at the stage where spraying would have caused damage to the corn.

(RCR Farms LLC Special Report, at AR 416 (emphasis added)). The NAU adjusters released the 2018 Corn Acres the day of their inspection, giving RCR Farms permission to destroy the few plants that had grown and prepare the ground for the next crop. (RCR Farms LLC Special Report, at AR 416; RCR Farms Reconsideration Request Letter, AR 1494-1499).

13. **RMA Elects to Participate in the Adjustment of RCR Farms Loss Claim for the 2018 Corn Acres.** On August 7, 2018, RMA—through the TRO—elected to participate in the adjustment of RCR Farms' loss claim for the 2018 Corn Acres as part of the RMA large claim review process. (*See* RMA GFP Reconsideration Determination Letter, at AR 1463). Consequently, shortly after they released the 2018 Corn Acres on August 1, NAU's adjusters informed RCR Farms that they were withdrawing their release (which is not allowed under the 2018 Policy) and directed RCR Farms not to do anything to the 2018 Corn Acres pending the TRO's field inspection. (RCR Farms Reconsideration Request Letter, AR 1494-1499; *see also* Common Crop Insurance Policy, AR 1-44).

14. **TRO Adjusters Inspect 2018 Corn Acres on August 22, 2018.** RMA adjusters did not come to inspect the 2018 Corn Acres until August 22, 2018—nearly a month after the RCR Farms filed its Notice of Loss and three weeks after the AIP adjusters released (and then "un-released") the 2018 Corn Acres and instructed RCR Farms not to do anything with the 2018 Corn Acres. (*See* October 11, 2018 Letter Requesting Additional Documentation from RCR Farms, AR

286). During this time period, there was no continuing duty for RCR Farms to provide care for the 2018 Corn Acres—it had been instructed by NAU not to do anything with the fields and there was no longer any "crop" to care for. (*See* RCR Farms LLC Special Report, at AR 416; NAU Photographs of 2018 Corn Acres, at AR 587-599).

15. **Heavy Rains Spur Weed Growth on the 2018 Corn Acres Prior to the TRO Adjusters' August 22 Field Inspection.** Between NAU's initial inspection on August 1, and the TRO field inspection on August 22, a few large rains fell on the 2018 Corn Acres. While these rains were not sufficient to save RCR Farms' 2018 corn crop, they did lead to significant weed growth on the 2018 Corn Acres. This is illustrated by the stark contrast between the photographs taken during NAU's August 1 inspection and the photographs taken during the TRO's August 22 inspection. (*Compare*, NAU Photographs of 2018 Corn Acres, at AR 587-599, *with* TRO Photographs of 2018 Corn Acres, AR 1755-2296).

16. **RCR Farms Could Not Have Implemented Further Weed Control in the Weeks Leading up to the TRO Adjusters' August 22 Field Inspection.** As a practical matter, there was little weed control that could have been done in the weeks leading up to the TRO's August 21 inspection. Heavy rains during this time prevented RCR Farms from spraying on most days because doing so after heavy rain creates deep ruts in fields that run irrigation patterns. Additionally, strong winds during this period prevented RCR Farms from spraying for weeds (spraying is prohibited if wind is over ten miles per hour). As a result, weeds grew rapidly on the 2018 Corn Acres between NAU Adjusters' August 1 inspection and the TRO Adjusters' August 22 inspection, accounting for the "heavy weed pressure" claimed by RMA. (*Compare*, NAU Photographs of 2018 Corn Acres, at AR 587-599, *with* TRO Photographs of 2018 Corn Acres, AR 1755-2296; *see also* RCR Farms Reconsideration Request Letter, at AR 1497-1498).

17.     **The GFP Determination.** On May 20, 2019, RMA issued the GFP Determination finding that RCR Farms had failed to follow GFP for the 2018 Corn Acres. (*See* RMA GFP Determination Letter, AR 1097-1105). The GFP Determination is comprised of two sub-determinations: (1) that the reduced seeding rates employed by RCR Farms for the 2018 Corn Acres were not a GFP (the "Seed Population Determination") and (2) that the weed control measures employed by RCR Farms for the 2018 Corn Acres were not a GFP (the "Weed Control Determination"). Neither the Seed Population Determination nor the Weed Control Determination analyzed RCR Farms' farming practices on a unit-by-unit basis. Instead, both sub-determinations made general findings for all of the 2018 Corn Acres in finding that RCR Farms failed to follow GFP.  (*See* RMA GFP Determination Letter, AR 1097-1105).

18.     **The Seed Population Determination.** The Seed Population Determination failed to analyze RCR Farms' seeding rates for the 2018 Corn Acres on a unit-by-unit basis, despite the varying seed rates utilized by RCR Farms on different units within the 2018 Corn Acres. Instead, the Seed Population Determination adopted "recommended" seed population rates from the Kansas Corn Production Handbook and Golden Harvest seed product information and applied this recommended seed population rate against RCR Farms' average plant population for all of the 2018 Corn Acres. RMA has never provided a unit-by-unit breakdown of the Seed Population Determination. (RMA GFP Determination Letter, AR 1097-1105; RMA GFP Reconsideration Determination Letter, AR 1462-1470). The recommended seed population rates relied on by the RMA are also inapplicable to RCR Farms' geographic area, Bent County, Colorado, which faces significantly greater water limitations. (RCR Farms Reconsideration Request Letter, at AR 1495).

19.    **TRO's Reliance on Seed Population Recommendations**. The Seed Population also stated that RCR Farms' reduced seeding rates were not a GFP because they did not comply with the Golden Harvest seed variety production information seeding recommendations:

> The seed variety documentation production information sheet indicates that plant populations less than 28,000 seeds per acre are not recommended . . . . You did not provide any documentation to support that you planted the Golden Harvest variety in accordance with the minimum recommended plant population for that variety. The plantings at a seeding rate of 22,500 would not qualify under a limited irrigation practice; thusly, the seeding rate cannot be considered adequate under a fully irrigated practice.

(RMA GFP Determination Letter, at AR 1100). According to Mr. Heggenstaller of Syngenta, however, the Golden Harvest recommended rate relied upon in the Seed Population Determination is not applicable to water-limited situations such as those faced by RCR Farms in Bent County for the 2018 crop year:

> Syngenta does not recommend seeding rates greater than 24,000 seeds/acre for dryland and limited irrigation environments, such as the situation described by RCR Farms. **The technical product information published for Syngenta seed products is intended for fully irrigated and non-water limited environments**. Optimum plant populations should always account for yield environment, with reduced populations recommended for fields like those managed by RCR Farms, which have an average APH below 150 bu/acre.

(Syngenta Seeding Rate Letter, AR 1501 (emphasis added)). The Seed Population also stated that RCR Farms' reduced seeding rates were not a GFP because they did not comply with seeding rate recommendations provided in the Kansas Corn Production Handbook. (RMA GFP Determination Letter, at AR 1102). The Seed Population Determination does not explain whether RMA considered any factors specific to Bent County, Colorado, when applying the seeding rate

recommendations in the Kansas Corn Production Handbook to the 2018 Corn Acres. (RMA GFP Determination Letter, at AR 1102).

20.     **The Weed Control Determination.** The Weed Control Determination failed to analyze RCR Farms' weed control practices on a unit-by-unit basis. Instead, the Weed Control Determination cites "photographic evidence"—the photographs taken during the TRO's August 21 field inspection—showing "heavy weed pressure" as the justification for its determination that RCR Farms failed to employ proper weed control practices for all of the units in the 2018 Corn Acres. The "photographic evidence" relied upon for the Weed Control Determination is not labeled with information showing the date/time taken, unit number, location, or subject matter depicted. (*See* TRO Photographs of 2018 Corn Acres, AR 1755-2296). RMA has never provided a unit-by-unit breakdown of the Seed Population Determination. (RMA GFP Determination Letter, AR 1097-1105; RMA GFP Reconsideration Determination Letter, AR 1462-1470)

21.     **The GFP Bulletin.** The GFP provides guidance to AIPs and RMA Field Offices regarding GFP determinations. According to the GFP Bulletin, when making a GFP determination, an adjuster must analyze whether "the producer followed GFP for **the insured unit in question**." (*See* GFP Bulletin, at p. 1 (emphasis added)).

22.     **The Example GFP Cases**. The GFP Handbook provides "FCIC-Approved Standards and Procedures for Administering Good Farming Practice Decisions and Determinations." (*See* GFP Handbook, at AR 45). Exhibit 7 to the GFP Handbook provides "Example GFP Cases" which illustrate how certain circumstances should be handled when making a GFP determination. (GFP Handbook, at AR 103-114). The first Example GFP Case, found at AR 103-105, illustrates that an adjuster should make GFP Determinations on a unit-by-unit basis. The fourth Example GFP Case, found at AR 113-114, states that the failure to provide

11

photographic evidence "labeled with . . . pertinent information indicated the date/time taken, unit number, location and subject matter depicted" provides grounds for an GFP determination to be rescinded.

23.     **RCR Farms' Request for Reconsideration.** On August 19, 2019, RCR Farms submitted a Request for Reconsideration to RMA per its procedures. Among other things, RCR Farms submitted extensive additional information regarding seeding rates and weed control, including unit-by-unit analyses of seeding varieties and rates, and the corresponding target yields for each unit in the 2018 Crop Acres (a necessary inquiry for purposes of GFP determinations, and which the TRO failed to make), for both the 2017 and 2018 crop years. The detailed information provided by RCR Farms showed that the seeding rates for each unit in the 2018 Corn Acres were sufficient to hit the yield guaranty and, in fact, the reduced plant population resulted in higher proportional water availability, thereby increasing the likelihood of a higher yield. (*See* RCR Farms Reconsideration Request Letter, AR 1494-1499; Tabs 7-16 to RCR Farms Reconsideration Request Letter, AR 1718-1754).

24.     **RMA Affirms the GFP Determination.** On November 22, 2019, RMA issued its reconsideration determination in which it upheld the GFP Determination (the "GFP Reconsideration Determination"). The reasoning provided by RMA in the GFP Reconsideration Determination was essentially identical to the reasoning provided in the GFP Determination. The GFP Reconsideration Determination failed to break down the Seed Population Determination and Weed Control Determination on a unit-by-unit basis. (*See* RMA GFP Reconsideration Determination Letter, AR 1462-1470).

25.     **RCR Files its Complaint for Judicial Review.** RCR Farms filed its Complaint for Judicial Review with this Court on June 4, 2020. (*See* RCR Farms' Complaint (Dkt. No. 1)).

## **STANDARD OF REVIEW**

Pursuant to 7 U.S.C. § 1508(a)(3)(A)(iii), crop insurance policies issued under the FCIA "shall not cover losses due to . . . the failure of the producer to follow good farming practices, including scientifically sound sustainable and organic farming practices." Pursuant to 7 U.S.C. § 1508(a)(3)(B)(iii), a producer "shall have the right to judicial review of the [GFP] determination without exhausting any right to a review under [§ 1508(a)(3)(B)(iii)(I)]".[4] The FCIA states that the standard of review for judicial review of GFP determinations is "arbitrary and capricious." 7 U.S.C. §1508(a)(3)(B)(iii)(II).

Pursuant to 5 U.S.C. § 706, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . (D) without observance of procedure required by law . . . [or] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." The standard of Section 706(2)(A) is a deferential one, but this does not mean that a Court must rubber-stamp agency decision making. *See Ohio v. Ruckelshaus*, 776 F.2d 1333, 1339 (6th Cir. 1985). Rather, a Court must ensure that the agency's decision is based on consideration of all relevant factors, and the Court's inquiry must be searching and careful, especially in highly technical cases. *See American Paper Institute v. Train*, 543 F.2d 328, 338 (D.C. Cir. 1976).

---

[4] Although the language of the policy purports to require exhausting of administrative remedies prior to bringing suit against the FCIC to contest a GFP determination, RMA has previously held this language void due to its conflict with 7 U.S.C. § 1508(a)(3)(B). *See* Final Agency Determination: FAD-044, available at https://legacy.rma.usda.gov/regs/533/2005/fad-044.html.

## ARGUMENT AND AUTHORITY

The Court should set aside the GFP Determination as arbitrary and capricious for three reasons. First—the GFP Determination is arbitrary and capricious because it fails to analyze whether RCR Farms employed GFP for the 2018 Corn Acres on a unit-by-unit basis as required by the 2018 Policy. Second—the Seed Population Determination is arbitrary and capricious because it applies an improper standard for determining whether the reduced seeding rates utilized by RCR Farms for the 2018 Corn Acres were consistent with GFP. Third—the Weed Control Determination is arbitrary and capricious because it is based on photographs that were taken weeks after RCR Farms submitted its Notice of Loss for the 2018 Corn Acres and that failed to provide pertinent information regarding the date/time taken, unit number, location and subject matter depicted. The failure of RMA[5] to analyze whether RCR Farms followed GFP on a unit-by-unit basis provides the Court with grounds to set aside the GFP Determination in its entirety. Nevertheless, the Seed Population Determination and Weed Control Determination are independently arbitrary and capricious, providing the Court with additional grounds to set aside the GFP Determination.

**I.** **THE GFP DETERMINATION IS ARBITRARY AND CAPRICIOUS BECAUSE IT FAILS TO ANALYZE WHETHER RCR FARMS EMPLOYED GFP FOR THE 2018 CORN ACRES ON A UNIT-BY-UNIT BASIS AS REQUIRED BY THE 2018 POLICY.**

The GFP Determination is arbitrary and capricious because both of its sub-determinations—the Seed Population Determination and Weed Control Determination—are improper blanket determinations that fail to analyze whether RCR Farms followed GFP for the

---

[5] FCIC is the proper defendant in this case pursuant to 7 U.S.C. § 1508, but the GFP Determination and GFP Reconsideration Determination were in fact issued RMA, acting as FCIC's administering agency under the Federal Crop Insurance Act. For simplicity, RCR Farms hereinafter refers to RMA, acting in its capacity as FCIC's administering agency, as "RMA."

2018 Corn Acres on a unit-by-unit basis. The 2018 Policy, GFP Handbook, and GFP Bulletin all require RMA to make GFP determinations on a unit-by-unit basis. RMA's failure to issue the GFP Determination in accordance with its own policies and procedures renders the GFP Determination arbitrary and capricious in its entirety.

The 2018 Policy requires that a loss claim be adjusted on a unit-by-unit basis. (*See* Common Crop Insurance Policy, § 3(a), at AR 13 ("[T]he production guarantee or amount of insurance, coverage level, and price at which an indemnity will be determined for **each unit** will be those used to calculate your summary of coverage for each crop year.") (emphasis added); Common Crop Insurance Policy, § 11(a), at AR 22 ("Coverage beings on **each unit or part of a unit** at the later of . . . .") (emphasis added); Common Crop Insurance Policy, § 11(b), at AR 22 ("Coverage ends on **each unit** or part of a unit at the earliest of . . . (3) final adjustment of loss on a **unit**." Common Crop Insurance Policy, § 15(a), at AR 25 ("The total production to be counted for a **unit** will include . . . .") (emphasis added); Common Crop Insurance Policy, § 21(b), at AR 37 ("You must retain, and provide upon our request . . . [c]omplete records of the planting, replanting, inputs, production, harvesting, and disposition of the insured crop on **each unit** . . . .") (emphasis added)). Given that a loss claim must be adjusted on a unit-by-unit basis, it follows that GFP determinations—which are part of the loss adjustment process—must be made on a unit-by-unit basis. Logically, just as a farmer may experience a loss on some units but not others, a farmer could also follow GFP on some units, but not others. Making GFP determinations on a unit-by-unit basis is thus the only way to ensure that a loss claim is adjusted properly under the 2018 Policy.

This interpretation of the 2018 Policy is in accord with the GFP Handbook, which provides several "Example GFP Cases" to illustrate the procedure AIPs and RMA should employ when

issuing GFP determinations. (*See* GFP Handbook, AR 52-63). Relevant here, the first Example GFP Case provided in the GFP Handbook involves a fictitious producer who "filed a notice of loss for drought (Unit 1 Non-Irrigated Spring Wheat) and heat (Unit 2 Irrigated Spring Wheat)." (GFP Handbook, at AR 52). This example proceeds to illustrate how a loss adjuster should determine whether the producer employed GFP, and provide a reasoned explanation for that determination, on a unit-by-unit basis. (GFP Handbook, at AR 52-54). Accordingly, even the official guidance provided in RMA's own GFP Handbook supports the conclusions that GFP determinations must be made on a unit-by-unit basis.

The clearest statement of the unit-by-unit GFP determination rule comes from the GFP Bulletin, which was published by RMA to clarify "how GFP decisions, determination, and reconsiderations are to be requested and made." (GFP Bulletin at p. 1). Among other things, the GFP Bulletin notes:

> It is the approved insurance provider's (AIP) responsibility to make a decision of whether (1) production methods that were used by the producer, or will be used by the producer, are considered GFP in accordance with the terms of the policy, and (2) that the producer followed GFP for the insured unit in question. This will typically occur during the loss adjustment process.

(GFP Bulletin at p. 1). Thus, according to the established procedure articulated in GFP Bulletin, all GFP determinations must include a decision as to whether the producer followed GFP for **the insured unit in question**. The GFP Bulletin, consistent with the 2018 Policy and GFP Handbook, mandates that all GFP determinations be rendered on a unit-by-unit basis.

RMA was clearly bound by the terms of the 2018 Policy when it participated in the adjustment of RCR Farms' loss claim for the 2018 Corn Acres. Moreover, there is no question that RMA was also required to follow the procedures established in the GFP Bulletin and the GFP

Handbook. It is well-established that an agency "must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its actions cannot stand and courts will strike it down." *United States v. Heffner*, 420 F2d. 809, 811-12 (4th Cir. 1969). This black-letter rule of administrative law was first set forth in *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and is often referred to as the *Accardi* Doctrine. In this case, the *Accardi* Doctrine required RMA to comply with the GFP Bulletin and the GFP Handbook, in addition to the 2018 Policy, when issuing the GFP Determination. In fact, under the *Accardi* doctrine, RMA would be bound by the terms of the GFP Bulletin and the GFP Handbook even if those documents are stricter than the 2018 Policy. *See Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 34 n. 3 (D.D.C. 1998) ("The *Accardi* doctrine holds that government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions."). Thus, the failure of an agency to follow its own policies and procedures will render its action arbitrary and capricious.

Here, RMA deviated from the established GFP procedure when it failed to determine whether RCR Farms followed GFP for the 2018 Corn Acreage on a unit-by-unit basis. This is true for both the Seed Population Determination and the Weed Control Determination. In the Seed Population Determination, RMA failed to analyze the seed populations planted by RCR Farms in the 2018 Corn Acres on a unit-by-unit basis. (*See* RMA GFP Determination Letter, at AR 1102). Rather, RMA adopted a "recommended" seed population rate and applied it to RCR Farms average seeding rate for all units in the 2018 Corn Acres. (*See* RMA GFP Determination Letter, at AR 1102). The one-size-fits-all seed population rate adopted by RMA does not satisfy the requirement that RMA make GFP determinations on a unit-by-unit basis.

Moreover, it is clear RMA understood that it was analyzing a loss claim involving multiple units, as the GFP Determination contains a breakdown for each unit in the 2018 Corn Acres in

terms of total acres, plant date, irrigation practice, and APH yield. (*See* RMA GFP Determination Letter, at AR 1098). RMA simply failed to provide a similar unit-by-unit analysis with respect to the Seed Population Determination. RMA even failed to provide a unit-by-unit determination for the Seed Population Determination after RCR Farms submitted detailed seed population memoranda explaining how the seed population rate for each unit was calculated to meet each unit's individual yield guaranty. (*Compare* Tabs 7-16 to RCR Farms Reconsideration Request Letter; AR 1718-1754, *with* GFP Reconsideration Determination Letter, AR 1464-1467 (applying an "average" actual seed population rate across the board to all units in the 2018 Corn Acres)). RMA's failure to analyze the seed population rates on a unit-by-unit basis violated its own rules, policies, and procedures, rendering the Seed Population Determination arbitrary and capricious.

The Weed Control Determination also deviated from RMA's established GFP procedure by failing to analyze the weed control issue on a unit-by-unit basis. In the Weed Control Determination, RMA concluded that RCR Farms failed to follow a recognized weed control program based on "photographic evidence show[ing] both heavy weed pressure around the time you applied your herbicide treatment as well as continued heavy weed pressure around harvest." (RMA GFP Determination Letter, at AR 1103). This summary conclusion was not accompanied by a unit-by-unit breakdown, and the photographic evidence cited therein did not provide any information regarding the date/time, units, locations, or subject matter for the photographic evidence. (RMA GFP Determination Letter, at AR 1103). Properly labeled photographs would have, at the very least, allowed RCR Farms to attempt to piece together a unit-by-unit understanding of the Weed Control Determination. The failure of the Weed Control Determination to determine whether RCR Farms employed proper weed control measures on a unit-by-unit basis

plainly violated RMA's rules, policies, and procedures regarding GFP determinations, rendering the Weed Control Determination arbitrary and capricious.

As the foregoing makes clear, RMA failed to analyze whether RCR Farms employed GFP for the 2018 Corn Acres on a unit-by-unit basis, in direct violation of the Policy, GFP Handbook, and the GFP Bulletin. RMA's failure to abide by the terms of the 2018 Policy and its own GFP policies and procedures with respect to the Seed Population Determination and Weed Control Determination was arbitrary and capricious. Accordingly, the GFP Determination should be set aside in its entirety.

## II.   THE SEED POPULATION DETERMINATION IS ARBITRARY AND CAPRICIOUS BECAUSE IT APPLIES AN IMPROPER STANDARD FOR DETERMINING WHETHER THE REDUCED SEEDING RATES EMPLOYED BY RCR FARMS FOR THE 2018 CORN ACRES WERE CONSISTENT WITH GFP.

RMA's Seed Population Determination is arbitrary and capricious because it applies an improper, one-size-fits-all recommended seeding rate in determining that the reduced seeding rates utilized by RCR Farms for the 2018 Corn Acres were not consistent with GFP.

The primary question in a GFP determination is whether "[t]he production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guaranty . . . are generally recognized by agricultural experts . . . for the area." (Common Crop Insurance Policy, § 1, at AR 5). The 2018 Policy defines an agricultural expert as: "Persons who are employed by the Cooperative Extension System or the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific crop or practice for which such expertise is sought." (Common Crop Insurance Policy, § 1, at AR 3). And, as explained above, a GFP determination

must be made on a unit-by-unit basis.[6] Based on the foregoing, RMA was required to answer two questions when determining whether the reduced seeding rates utilized by RCR Farms were consistent with GFP: (1) would the reduced seeding rates utilized by RCR Farms allow the corn crop on each insured unit in the 2018 Corn Acres to make normal progress toward maturity and produce at least the yield used to determine the production guaranty; and (2) were the reduced seeding rates utilized by RCR Farms generally recognized by agricultural experts for the area.

RCR Farms provided detailed information on both points that was sufficient to establish that RCR Farms' reduced seeding rates for the 2018 Corn Acres were consistent with GFP. RCR Farms provided detailed breakdowns of the seeding rates and target yields for each unit in the 2018 Corn Acres for both the 2018 and 2018 crop years. (*See* Tabs 7-16 to RCR Farms Reconsideration Request Letter, AR 1718-1754). These detailed breakdowns showed how the reduced seeding rated utilized by RCR Farms would allow each unit in the 2018 Corn Acres to progress to maturity and produce at least the yield to determine the production guaranty for each unit. RCR Farms also provided information showing that its reduced seeding rates were generally recognized by agricultural experts as an accepted farming practice in water-limited situations. (*See* Syngenta Seeding Rate Letter, AR 1501; Corn Populations and Deficit Irrigation in Western Nebraska, AR 583-586). Finally, RCR Farms provided RMA with ample evidence of the water limitations it faced for the 2018 Corn Acres throughout the 2018 crop year. (*See* Crop Quest Letter, AR 287; Fort Lyon Canal Company Letter, AR 514; Arkansas Basin Snow Pack Report, AR 523-525; Valley Ag Consulting Letter, AR 290-292; U.S. Drought Monitor, Colorado (April 17, 2018), AR

---

[6] The production guaranty for an insured crop is determined on a unit-by-unit basis. (*See* RCR Farms 2018 Spring Acreage Report, AR 249-267). Accordingly, an AIP or RMA is necessarily required to analyze GFP on a unit-by-unit basis to determine whether the producer's farming practices will allow the insured crop to produce at least the yield used to determine the production guaranty.

1095; U.S. Drought Monitor, Colorado (May 1, 2018), AR 1096). Together, the information provided by RCR Farms shows that: (1) RCR Farms faced water limitations for the 2018 Corn Acres; (2) RCR Farms utilized reduced seeding rates that would allow the water-limited 2018 Corn Acres to progress normally to maturity and produce at least the yield used to determine the production guaranty for each unit; and (3) agricultural experts recognize the use of reduced seeding rates in water-limited situations as an acceptable farming practice. Therefore, RCR Farms provided RMA adequate information from which it could determine the seeding rates utilized by RCR Farms were consistent with GFP.

In stark contrast to the detailed, unit-by-unit seeding rate analysis performed by RCR Farms is the one-size-fits-all recommended seeding rates adopted by RMA. In the GFP Determination, RMA stated that:

> Your stated average plant populations of 22,500 plants per acre did not reach the recommended irrigated rate of 28,000 to 34,000 plants per acre according to the Kansas Corn Production Handbook. Your stated plant populations did not even meet the recommended rate for limited irrigation of 24,000 plants per acre.
>
> . . .
>
> In addition, for the Golden Harvest variety that had a minimum recommended plant population of 28,000 plants per acre, you did not provide documentation to indicate you followed that recommendation.

(RMA GFP Determination Letter, at AR 1102). Because RCR Farms' average seeding rate for the units in the 2018 Corn Acres was below the recommended seeding rates adopted by RMA, RMA determined that RMA Farms failed to follow GFP for all of the 2018 Corn Acres. (RMA GFP Determination Letter, at AR 1102). RMA's reliance on these recommended seeding rates was improper.

To begin, RMA's reliance on the recommended seeding rate contained in the Golden Harvest product information sheet has been expressly rejected by Andy Heggenstaller, the Head of Agronomy, US Seed, for Syngenta—the owner of the Golden Harvest seed variety. According to Mr. Heggenstaller, the 28,000 plants per acre seeding rate recommended in the Golden Harvest product information sheet is not applicable to water-limited environments, such as Bent County, Colorado, during the 2018 crop year. (Syngenta Seeding Rate Letter, AR 1501). Indeed, Mr. Heggenstaller explicitly states that seeding rates lower than 24,000 plants per acre are acceptable for the Golden Harvest seed variety in water-limited environments. (Syngenta Seeding Rate Letter, AR 1501). Mr. Heggenstaller further confirms that specific seeding rates employed by a producer should "account for yield environment, with reduced populations recommended for fields like those managed by RCR Farms, which have an average APH below 150 bu/acre." (Syngenta Seeding Rate Letter, AR 1501). The seeding rates utilized by RCR Farms for the 2018 Corn Acres, consistent with Mr. Heggenstaller's guidance, took into account the unique characteristics of the units in the 2018 Corn Acres (i.e., water limitations, historic yields, soil quality, etc.). (Tabs 7-16 to RCR Farms Reconsideration Request Letter, AR 1718-1754). Put simply, the head of agronomy for the seed company that owns the Golden Harvest seed variety explicitly disapproved of RMA's use of the standard 28,000 plants per acre seeding rate contained in the Golden Harvest product information to determine that RCR Farms' reduced seeding rates were not consistent with GFP. Thus, RMA's reliance on the Golden Harvest product information as a basis for the Seed Population Determination is arbitrary and capricious.

RMA's reliance on seeding recommendations from the Kansas Corn Production Handbook is similarly misguided. Under the 2018 Policy, and RMA's policies and procedures, a GFP determination must take into consideration the location of the insured unit in question. (Common

Crop Insurance Policy, § 1, at AR 3; GFP Bulletin at p. 1). The Kansas Corn Production Handbook may provide some insight into standard corn seeding rates generally, but it does not account for various factors that are specifically applicable to the 2018 Corn Acres. Additionally, the Seed Population Determination makes no effort to explain how it independently accounted for factors specific to Bent County, Colorado (e.g., wind, water limitations, heat, etc.) when applying the Kansas Corn Production Handbook seeding recommendations to each unit in the 2018 Corn Acres. (RMA GFP Determination Letter, at AR 1102). Rather, RMA mechanically applied the Kansas Corn Production Handbook seeding rates without making any adjustments to account for factors specific to the 2018 Corn Acres (and without analyzing the seeding rates on a unit-by-unit basis). RMA's failure to tailor its seeding rate analysis to the specific situation faced by RCR Farms with respect to the 2018 Corn Acres resulted in the Seed Population Determination applying standards inapplicable to the 2018 Corn Acres.

Finally, RMA's use of "recommended" seeding rates generally conflicts with the plain language of the 2018 Policy's GFP requirement. The question for purposes of a GFP determination is not whether a particular seeding rate is "recommended," but rather whether it will allow the insured crop to produce at least the yield used to determine a particular insured unit's yield guaranty. (Common Crop Insurance Policy, § 1, at AR 3). By focusing on blanket recommended seeding rates, RMA entirely failed to analyze whether RCR Farms' reduced seeding rates would allow each unit in the 2018 Corn Acres to meet the yield used to determine the production guarantee. For the purposes of a GFP determination concerning seeding rates, RMA is required to determine whether the actual seeding rates—whether recommended or not—will allow each insured unit to produce at least the yield used to determine the production guaranty. RMA's failure

to conduct that analysis with respect to the 2018 Corn Acres further renders the Seed Population Determination arbitrary and capricious.

RCR Farms provided RMA sufficient information to determine that the reduced seeding rates for the 2018 Corn Acres were consistent with GFP. In response, RMA relied on inapplicable standards and failed to analyze whether RCR Farms' seeding rates would allow each insured unit in the 2018 Corn Acres to produce at least the yield used to determine RCR Farms' production guaranty. Accordingly, the Seed Population Determination is arbitrary and capricious and should be set aside.

III.   **THE WEED CONTROL DETERMINATION IS ARBITRARY AND CAPRICIOUS BECAUSE IT IS BASED ON PHOTOGRAPHS TAKEN WEEKS AFTER RCR FARMS SUBMITTED ITS NOTICE OF LOSS FOR THE 2018 CORN ACRES THAT DO NOT PROVIDE INFORMATION REGARDING THE DATE/TIME TAKEN, UNIT NUMBER, LOCATION, AND SUBJECT MATTER DEPICTED.**

RMA's Weed Control Determination is based on photographs taken during the TRO's August 22 inspection of the 2018 Corn Acres (the "TRO Photographs"). The Weed Control Determination states that RCR Farms "failed to follow a generally recognized good farming practice by failing to follow a recognized weed control program." (GFP Determination Letter, AR at 1103). This finding was based on the TRO Photographs "show[ing] heavy weed pressure around the time you applied your herbicide treatment as well as continued heavy weed pressure around harvest." (RMA GFP Determination Letter, AR at 1103; TRO Photographs of 2018 Corn Acres, AR 1755-2838). RMA's reliance on the TRO Photographs is arbitrary and capricious because (1) the TRO Photographs were taken weeks after RCR Farms submitted its Notice of Loss and was expressly instructed by NAU not to do anything with the Corn Acres; and (2) the TRO Photographs do not provide pertinent information regarding the date/time taken, unit number(s), location(s), and subject matter depicted.

The Weed Control Determination's reliance on the TRO Photographs ignores several important facts regarding the "heavy weed pressure" depicted in the TRO Photographs. To begin, the Weed Control Determination fails to acknowledge that the heavy weed pressure depicted in the TRO Photographs is not present during the NAU adjusters August 1 field inspection. (NAU Photographs of 2018 Corn Acres, at AR 587-598). The Weed Control Determination also fails to account for the heavy rains and strong winds that affected the 2018 Corn Acres between the NAU adjusters August 1 field inspection that TRO's August 22 field inspection. The heavy rains, while not sufficient to save RCR Farms' 2018 corn crop, were sufficient to spur significant weed growth prior to the TRO's August 22 field inspection. Moreover, although RCR Farms was not obligated to apply weed control measures after August 1 (both because NAU expressly instructed RCR Farms to do nothing with the 2018 Corn Acres until the TRO field inspection and because there was no longer any "crop" to care for), the heavy wind and strong wind would have prevented RCR Farms from applying weed control measures to the 2018 Corn Acres anyway. The instructions from NAU, rain, wind, and delay in the TRO field inspection provide an alternate explanation for the heavy weed pressure depicted in the TRO Photographs that does not involve RCR Farms failing to implement proper weed control measures. Finally, RMA's Weed Control Determination conflicts with the NAU adjusters' conclusion that the limited weed pressure present on the fields during their August 1 inspection was caused by the same cause of loss that caused the failure of RCR Farms 2018 corn crop. (RCR Farms LLC Special Report, at AR 416). Therefore, because the Weed Control Determination is based on the TRO Photographs that distort the weed pressure present on the fields at the time RCR Farms filed is Notice of Loss and was instructed to refrain from doing anything with the 2018 Corn Acres, and fails to account for the totality of the

circumstances regarding the weed pressure depicted in the TRO Photographs, RMA's Weed Control Determination is arbitrary and capricious.

The Weed Control Determination is also arbitrary and capricious because the TRO Photographs fail to provide information regarding the date/time the photographs were taken, the unit number(s) involved, the location(s) where the photographs were taken, or the subject matter depicted. (*See* TRO Photographs of 2018 Corn Acres, AR 1755-2838). Pursuant to the GFP Handbook, the failure to provide such information is grounds for a GFP Determination to be retracted. (*See* GFP Handbook, at AR 103-114). Without this information (or a unit-by-unit breakdown of the Weed Control Determination) RCR Farms is forced to guess regarding how RMA analyzed the weed control issues for each unit. In effect, RCR Farms was denied the ability to properly respond to the Weed Control Determination. RMA's failure to properly label the photographic evidence that supported the Weed Control Determination (or, in the alternative, provided a detailed unit-by-unit breakdown of the Weed Control Determination) further renders that determination arbitrary and capricious.

As the foregoing makes clear, RMA ignored important relevant facts regarding the weed pressure on the 2018 Corn Acres in rendering the Weed Control Determination. By relying only on the TRO Photographs, RMA failed to account for various other factors that contributed to the weed pressure evidenced by the TRO Photographs. Further, RMA failed to properly label the photographs with pertinent information in violation of its own policies and procedures. Together, these errors render the Weed Control Determination arbitrary and capricious. Accordingly, this Court should set that determination aside.

## **CONCLUSION**

For the foregoing reasons, RCR Farms requests that the Court hold as unlawful and set aside RMA's GFP Determination on the grounds that it is arbitrary and capricious, not in accordance with law, without observance of procedure required by law, and unwarranted by the facts.

Respectfully submitted this 28th day of December, 2020

/s/ Jeff L. Todd
Jeff L. Todd
Jeremiah L. Buettner
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102-7103
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
Email: jeff.todd@mcafeetaft.com
         jeremiah.buettner@mcafeetaft.com

## **CERTIFICATE OF SERVICE**

      I do hereby certify that a true and correct copy of the above and foregoing pleading was electronically served on counsel of record listed below through the Court's CM/ECF filing system on this 28th day of December, 2020.

      Ian J. Kellogg
      Ian.kellogg@usdoj.gov

                   */s/ Jeff L. Todd*