**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01602-REB

RCR FARMS, LLC,

      Petitioner,

v.

FEDERAL CROP INSURANCE CORPORATION,

      Respondent.

---

**RESPONSE BRIEF**

---

      Respondent the Federal Crop Insurance Corporation ("FCIC") submits this response to Petitioner's Opening Brief (ECF No. 17):

## INTRODUCTION

      Petitioner farms corn in Bent County, Colorado.  In 2018, Petitioner (RCR Farms) purchased crop insurance for irrigated corn that was re-insured and subsidized by the FCIC.  At issue in this administrative appeal is the FCIC's determination that RCR Farms did not follow "good farming practices."  Good farming practices ("GFP") are production methods used to produce the insured crop to allow it to make normal progress toward maturity and produce at least the amount of crop used to determine the insured's production guarantee (which is based on its historical production of the same crop).  The FCIC found that RCR Farms did not follow GFP because RCR Farms planted too little corn per acre, and because it did not apply any weed control until it was too late to be effective.

Petitioner contends that the entire GFP determination was arbitrary or capricious because the FCIC did not examine RCR Farms' practices on a "unit-by-unit" basis.  But RCR Farms elected to insure all 2,498.56 acres of its irrigated corn as an "Enterprise unit"—a single unit consisting of *all acres* of RCR Farms' irrigated corn in Bent County.  By doing so, RCR Farms paid far less in policy premiums than it would have if it had chosen to insure its corn on the basis of smaller subdivisions of its acreage, called "optional units."  RCR Farms cites no authority, and no record evidence supports, requiring the FCIC to make a GFP determination on the basis of any "unit" other than the unit for which a producer purchased insurance.  *Infra* Argument Part I.A.  *How much* of Petitioner's claimed loss resulted from its failure to follow GFP, and with it the amount of insurance indemnity to which RCR Farms is ultimately entitled, were not before the agency in rendering its GFP determination (they are part of a separate agency action), and are not before the Court in this case.  *Infra* Argument Part I.B.

Petitioner also argues that the GFP determination regarding its planting population was arbitrary or capricious because RCR Farms provided letters stating that planting fewer seeds is appropriate in water-limited situations.  But RCR Farms purchased insurance for "irrigated" corn.  An "irrigated" practice requires a producer to have a reasonable expectation of receiving adequate water, and, if a producer knows before planting that his water may be reduced, then he cannot report as irrigated—or receive insurance coverage for—the acreage for which he had no reasonable expectation of receiving adequate water.  Here, RCR Farms admits, and indeed argues throughout its brief, that it knew prior to planting that its water would be reduced.  (That is why, RCR Farms claims, its decision to plant fewer seeds spread across more acres was a good one.)  Because RCR Farms' insurance policy covered "irrigated" corn, the FCIC

appropriately looked to expert publications concerning the recommended seeding rates for irrigated corn in assessing whether RCR Farms followed GFP for its insured crop. And the FCIC properly discounted RCR Farms' contention that its planting practices were appropriate for irrigation-limited scenarios, though, as the FCIC found, RCR Farms' seeding rate would have been inadequate even under a water-limited practice. In reaching these conclusions, the FCIC appropriately relied on seeding rates recommended in the Kansas Corn Production Handbook (among other sources). As the FCIC noted, "Kansas is an adjoining state to Colorado with similar climate, growing season, and topography." And RCR Farms points to no record evidence that the conditions in Kansas are so dissimilar to Bent County, 60 miles to the west, that it was erroneous for the FCIC to rely on the Kansas Corn Production Handbook. Indeed, the email on which RCR Farms primarily relies in arguing that its seeding rate was appropriate is itself based on research from Kansas—as well as Colorado and Nebraska, the locations of the other expert studies cited by the FCIC. *At best*, Petitioner's argument boils down to a difference of opinion as to whether its seeding rate was consistent with GFP for irrigated corn, but a difference of scientific or expert opinion is not grounds to overturn an agency action. *Infra* Argument Part II.

Finally, RCR Farms' argument that the FCIC's weed-control determination was arbitrary and capricious is based on an apparent misunderstanding of the record evidence on which the FCIC relied in reaching its decision. RCR Farms complains that the FCIC relied exclusively on evidence of weed pressure seen in photographs taken by an FCIC representative on August 22, 2018. In fact, the FCIC also relied on photographs taken three weeks earlier that also showed weed pressure in "most of" RCR Farms' fields, including "some fields [with] high

weed and grass pressure."  In addition, photographs were not the only evidence on which the FCIC relied: the FCIC found that RCR Farms' limited records showed that RCR Farms applied herbicide "too late for the critical period of weed control."  *Infra* Argument Part III.

RCR Farms has not demonstrated that the FCIC's GFP Determination was arbitrary or capricious.  The agency decision should be affirmed, and this case should be dismissed.

## BACKGROUND

### I. Statutory and Regulatory Framework.

The Federal Crop Insurance Act ("FCIA") was enacted "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance." 7 U.S.C. § 1502(a).  The FCIC is a federally owned corporation created to carry out the purposes of the FCIA, 7 U.S.C. § 1503, which it does by, *inter alia*, re-insuring crop insurance policies purchased from authorized insurance providers, or "AIPs," and subsidizing insurance premiums paid by farmers for their policies, *see, e.g.*, 7 U.S.C. §§ 1508(a)(1), (e).  The level of coverage and amount of subsidy depend, among other things, on the crop, location, and type of policy selected by the insured.  *See, e.g.*, 7 C.F.R. § 457.3.

Whatever the type of policy, no FCIC-subsidized crop insurance may "cover losses due to . . . the failure of the producer to follow good farming practices."  7 U.S.C. § 1508(a)(3)(A)(iii); *see also* Common Crop Ins. Policy § 12(b) (AR00022) (providing that "[f]ailure to follow recognized good farming practices for the insured crop" is "NOT covered"). "Good farming practices" are defined as:

> The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance . . . which are those generally recognized by agricultural experts . . . , depending on the practice, for the area.

7 C.F.R. § 457.8; *see also* Common Crop Ins. Policy § 1 (AR00005) (same).

A recipient of federally supported crop insurance bears the burden of proving that it utilized good farming practices. *See* GFP Handbook § 22 (AR00060) ("Policyholders are responsible for establishing that the farming practice in question was a good farming practice.") Consistent with this obligation, producers are required to maintain records that would be sufficient to establish that they followed GFP. *See, e.g., id.* § 24(A)(1) (AR00065) ("The Policyholder must provide the AIP with all the relevant facts relating to their agronomic situation, including but not limited to: (a) receipts; (b) farm records; (c) third party verification; . . . and (e) any other documentation to show the practice is or is not a recognized GFP, as requested."); FCIC Manager's Bulletin MGR-05-010 ("GFP Bulletin") at 3 (same)[1]; *see also* Common Crop Ins. Policy § 21 (Access to Insured Crop and Records, and Record Retention) (AR00036-37).

The Risk Management Agency ("RMA"), a component of the U.S. Department of Agriculture, supervises the FCIC and administers and oversees the FCIA. 7 U.S.C. § 6933; 7 C.F.R. § 400.900. RMA has the final agency word on whether a producer followed good farming practices. *See* 7 C.F.R. § 400.98(e), (f); Common Crop Ins. Policy § 20(d)(2) (AR00036).

**II. RCR Farms insures a 2,498.56-acre Enterprise unit of irrigated corn.**

In 2018, RCR Farms purchased an FCIC-subsidized and reinsured crop insurance policy with revenue protection covering 2,498.56 acres of irrigated corn from NAU Country Insurance

---

[1] The FGP Bulletin, which is cited by Petitioner in its brief, *see, e.g.*, Pet. Br. at 2, is available at https://legacy.rma.usda.gov/news/managers/2005/PDF/mgr-05-010.pdf (last visited Jan. 23, 2021).

Company ("NAU"). *See, e.g.*, GFP Determination at 2 (AR01098); Policy/Transfer Application (AR02843); Policy Holder Report (AR02847).

Insurance coverage is based on a producer's actual production history ("APH") in farming the same crop—here, irrigated corn—in prior years. *See* Common Crop Ins. § 1 (AR00002-07) (defining, *inter alia*, Actual Production History, approved yield, production guarantee, and revenue protection); 7 C.F.R. § 400.55. RCR Farms' 2018 APH included its 2017 production. In 2017, RCR Farms planted 1,144.79 acres of irrigated corn and produced an average weighted yield of 158 bushels per acre. *See* GFP Redetermination at 4-5 (AR01465-66); AR01117-259 (2017 seeding and harvest data). 2017 was, according to RCR Farms, an "exceptionally good year." GFP Redetermination at 4 (AR01465); *see also* AR01339, 51 (RCR Farms' seeding rate information, stating same). In 2018, RCR Farms' APH yield—the approved yield used to calculate its production guarantee—was 147-177 bushels per acre. GFP Redetermination at 4 (AR01465); *see also* GFP Determination at 2 (AR01098). In order to comply with good farming practices, RCR Farms was required to utilize production methods that would allow it to produce at least 147-177 bushels of corn per acre. *See* Common Crop Ins. Policy § 1 (AR00005) (defining good farming practices).

Petitioner selected an 80% coverage level. GFP Determination at 2 (AR01098); Policy Holder Report (AR02847). This means that if RCR Farms had suffered a production loss solely due to unavoidable, naturally occurring events, Common Crop Ins. Policy § 12 (AR00022), RCR Farms could receive an indemnity, depending on the severity of the loss, of up to 80% of the value of the crop as calculated under the policy, *see, e.g.*, *id.* § 1 (AR00002-07) (defining, *inter alia*, APH, approved yield, production guarantee, and revenue protection).

6

Petitioner also elected to insure its acres of irrigated corn as an Enterprise unit.  *See, e.g.*, Policy Application (AR02843) (selecting "EU," or Enterprise unit coverage); GFP Determination at 2 (AR01098).  An "Enterprise unit" is defined as "[a]ll insurable acreage of the same insured crop or all insurable irrigated . . . acreage of the same insured crop in the county in which you have a share on the date coverage begins for the crop year . . . ."  Common Crop Insurance Policy § 1 (AR00005); *see also id.* § 34(a) (AR00040) (explaining the criteria for electing enterprise unit coverage).

Other unit-bases on which a producer might elect to insure its crops are set out in the Common Crop Insurance Policy, section 34 ("Units") (AR00040-4.).  Those include, for example, "optional units," which are subdivisions of all insurable acreage of the insured crop into smaller, identifiable planting acres.  Common Crop Ins. Policy § 34(b), (c) (AR00042-43) (discussing the requirements for optional-unit insurance).[2]

By insuring all of its acres of irrigated corn in Bent County as an Enterprise unit, RCR Farms was able to obtain 80% revenue protection while having 68% of its policy premiums subsidized by the FCIC.  *See infra* note 2 (Bent County Subsidy Factors).  If, alternatively, RCR Farms had elected to insure its irrigated corn with 80% revenue protection on an optional unit basis, only 48% of its policy premiums would have been subsidized by the FCIC.  *See id.*  As

---

[2] A producer can also select to insure its crop a "basic" or "whole-farm" unit basis.  *See id.* § 1 (AR00004) (defining basic unit); *id.* (AR00008) (defining Whole-farm unit); *see also generally id.* § 34 (AR00040-43) (discussing different units on which basis insurance may be sought and the criteria for same).  A table of coverage levels and subsidy factors for insuring irrigated corn in Bent County in 2018 with revenue protection on various unit-bases can be found on RMA's website, https://webapp.rma.usda.gov/apps/actuarialinformationbrowser2018/CropCriteria.aspx, by selecting (1) commodity – corn, (2) commodity year – 2018, and (3) insurance plan – revenue protection, for (4) Bent County, Colorado. (last visited Jan. 23, 2021).

explained by RMA on its website, "Premium discounts are offered for EUs [enterprise units] to

recognize the lower risk associated given the geographic diversification." [3]

RCR Farms purchased insurance for "irrigated corn."  Pet. Br. at 2; *see also, e.g.*, GFP

Determination at 2 (AR01096) (reflecting "IRR," or irrigated, practice).  Irrigated practice is

defined as:

> A method of producing a crop by which water is artificially applied during the
> growing season by appropriate systems and at the proper times, with the intention
> of providing the quantity of water needed to produce at least the yield used to
> establish the irrigated production guarantee or amount of insurance on the
> irrigated acreage planted to the insured crop.

Common Crop Ins. Policy § 1(AR00006).[4]  Because RCR Farms insured an irrigated practice, it

could report as irrigated—and receive coverage for—"only that acreage for which [it had]

adequate facilities and adequate water, *or the reasonable expectation of receiving adequate*

*water at the time coverage begins, to carry out a good irrigation practice*."  Common Crop Ins.

§ 9(b) (AR00021) (emphasis added).  If, prior to planting its irrigated corn, RCR Farms "knew

---

[3] https://www.rma.usda.gov/en/Fact-Sheets/National-Fact-Sheets/Enterprise-Units (last visited Jan. 23, 2021).  If the Court is interested, more information concerning the various insurable units, and why producers might choose one insure on the bases of one or another, can be found (among other places) in the following publicly available sources. *See, e.g.*, RMA, *2018 Crop Insurance Handbook* Part 10 ("Units"), *available at* https://www.rma.usda.gov/-/media/RMA/Handbooks/Coverage-Plans---18000/Crop-Insurance-Handbook---18010/2018-18010-2H-Crop-Insurance-Handbook.ashx (last visited Jan. 27, 2021); S. Johnson, *Comparing Enterprise Units to Basic or Optional Units*, Iowa State University, *available at* https://www.extension.iastate.edu/sites/www.extension.iastate.edu/files/polk/100202FebruaryUpdate.pdf (last visited Jan. 26, 2021).
[4] Drought is not an insurable cause of loss for an "irrigated" practice. *See, e.g.*, Loss Adjustment Manual Standards Handbook at 23 ("Drought cannot be a COL under a IRR Practice."), *available at* https://www.rma.usda.gov/-/media/RMA/Handbooks/Loss-Adjustment-Standards---25000/Loss-Adjustment-Manual/2018-25010-2H-Loss-Adjustment-Manual.ashx (last visited Jan. 24, 2021).

or had reason to know that [its] water may be reduced . . . no reasonable expectation exists." Common Crop Ins. § 9(b) (AR00021).[5]

### III.  RCR Farms learns before planting that it will receive less water for its irrigated corn.

In April 2018, more than a month before it began planting acres of irrigated corn, RCR Farms learned that it would be facing "significant water limitations."  Pet. Br. at 3.  On April 12, 2018, the Fort Lyon Canal Company—from which RCR Farms receives irrigation water—informed RCR Farms and its other stockholders that the snowpack that fed its water supplies was at only 65% of average.  AR00285.[6]  Due to the expected 35% reduction in water available from snowpack, the Canal Company letter explained that, assuming Arkansas River flow levels were sufficient to keep enough water in the canal, the Canal Company hoped to use reservoir storage water to be able to offer at least "ten runs between now and September 1."  *Id.*  That is, the canal company informed RCR Farms that it could expect runs of irrigation water from the reservoirs approximately once every 14 days between April 12, 2018 and September 1, 2018. As explained in one of the letters submitted by RCR Farms, 10 or more days between runs of irrigation water—especially when the runs are from "clear" storage reservoir water, as opposed to "dirty" water, which allows for "irrigate[ing] more acres faster and better"—is insufficient to be able to fully and adequately irrigate a corn crop.  AR00291; *see also* AR000287 (letter from RCR Farms' crop consultant acknowledging that RCR Farms was aware that it would be "low

---

[5] RCR Farms' coverage began on the dates that it planted its corn.  *See* Common Crop Ins. Policy § 1 (AR00005) (defining "coverage begins, date").
[6] RCR Farms initially provided an undated copy of this letter.  *See* AR00514.  RMA obtained a dated copy of the letter from the Canal Company.  *See* AR00284-85.

on runs of water"); AR01095 (U.S. Drought Monitor, Colorado) (Apr. 17, 2018); AR00524

(Arkansas Basin Snow Pack Report) (Apr. 15, 2018).

## IV.  Knowing it would have less irrigation water, RCR Farms planted less corn per acre (on more acres) and expected higher yields.

Knowing that it would face significant water limitations, RCR Farms planted 2,429.1

acres of irrigated corn between May 13, and May 25, 2018.  *See e.g.*, GFP Determination at 2

(AR01098); ER02847-48 (Policyholder Report).  In contrast with its past practice (that

generated the APH yield on which its insurance guarantee was based), RCR Farms decided to

plant significantly less corn per acre.  In 2017, for example, RCR Farms planted 1,144.79 acres

of irrigated corn with an average of 25,345 seeds per acre.  GFP Redetermination at 4-5

(AR01465-66).  RCR Farms' 2017 planting resulted in an average yield of 158 bushels per acre,

an "exceptionally good year."  *Id.* at 4 (AR01465); *see also* AR01339, 51 (RCR Farms' seeding

rate information, stating same).  In 2018, RCR Farms planted 2,429.1 acres with an average of

17,822 seeds per acre.  GFP Redetermination at 4 (AR01465).  RCR Farms stated that it

expected this planting to generate between 147 and 177 bushels of corn per acre.  *Id.*; *see also*

GFP Determination at 2 (AR01098).  RCR Farms contends that its decision to plant fewer seeds

per acre over more surface area would allow "more water to be utilized per plant."  Pet. Br. at 3.

## V. RCR Farms sought and received a prevented-planting indemnity on 69.46 of its 2,498.56 acres of irrigated corn.

RCR Farms planted only 2,429.1 of its 2,498.56 acres of insured irrigated corn.  *Supra*

Part IV.  For its other 69.46 acres of irrigated corn, RCR Farms received a "prevented planting

indemnity."  GFP Determination at 2 (AR01098).  "Prevented planting" refers to the:

> Failure to plant the insured crop by the final planting date designated in the
> Special Provisions for the insured crop in the county, or within any applicable late

> planting period, due to an insured cause of loss that is general to the surrounding area and that prevents other producers from planting acreage with similar characteristics.

Common Crop Ins. Policy § 1 (AR00006); *see also* Coarse Grain Crop Provisions § 12 (AR00121, 27).  Prevented planting coverage is available for irrigated acreage if, prior to planting, "there is not a reasonable expectation of having adequate water to carry out an irrigated practice or you are unable to prepare the land for irrigation using your established irrigation method."  Common Crop Ins. Policy § 17(d)(1)(ii)(A) (AR00028); *see also id.* (If a producer "knew or had reason to know on the final planting date . . . that [its] water will be reduced, no reasonable expectation exists.").[7]

## VI.  RCR Farms makes a claim of loss for the entire 2,498.56-acre Enterprise unit.

On July 23, 2018, RCR Farms submitted a single notice of loss for the entire 2,498.56 acres of its Enterprise unit, claiming "hot wind" as the cause of damage.  AR000247 (notice of loss); GFP determination at 2 (AR01098); *see also* Loss Adjustment Manual Standards Handbook at 331 (identifying cause of loss 62 as "hot wind").

## VII.  RMA determines that RCR Farms did not follow good farming practices.

On May 20, 2019, RMA determined that RCR Farms failed to follow recognized good farming practices for irrigated corn.  GFP Determination (AR01097-1105).

---

[7] Publicly available data reflect that more than 3,500 acres of irrigated corn in Bent County were indemnified as prevented planting in 2018.  This information can be found by visiting RMA's *Cause of Loss Historical Data Files*, selecting 2018, and filtering results for corn in Bent County with a prevented planting causes of loss, available at https://www.rma.usda.gov/Information-Tools/Summary-of-Business/Cause-of-Loss (last visited Jan. 24, 2021).

### A. Planting fewer seeds on more acres while expecting less water (and anticipating higher yields) did not constitute good farming practices for irrigated corn.

RMA first determined that RCR Farms failed to follow GFP with respect to how much corn that it planted. GFP Determination at 6 (AR01102). RCR Farms stated that it planted an average of 22,500 plants per acre, with some acres planted with as few as 15,000 plants per acre. *Id.* at 4, 6 (AR01100, 02). (In the GFP Determination, RMA relied on RCR Farms' stated plant population. *Id.* at 6 (AR01102). It turned out that RCR Farms' actual planting rate, once it submitted documentation to RMA, was lower, only 17,822 seeds per acre. *See infra* Part VIII.A.[8]) But, for *irrigated* corn—the practice for which RCR Farms was insured—experts recommend planting far more corn, between "28,000 to 34,000 plants per acre." GFP Determination at 3 (AR01099) (quoting Kansas Corn Production Handbook at 12 (AR01051)); *see also* GFP Determination at 6 (AR01102).[9] The product information for the "brand of seeds utilized by RCR Farms for the 2018 Corn Acres," Petitioner's Br. at 4 n.3; *see also* GFP Determination at 4 (AR01100), likewise indicated that at least 28,000 seeds per acre should be planted for irrigated corn, GFP Determination at 4 (AR01100) ("The seed variety documentation product information sheet indicates that plant populations less than 28,000 seeds per acre are not recommended.") (citing AR01088); *see also id.* at 6 (AR01102) (referencing same). Another study cited by RMA in its decision, *Corn Populations and Deficit Irrigation in Western Nebraska*, "recommended a plant population of 26,000 plants per acre." GFP

---

[8] The number of seeds per acre is less than the number of plants per acre, as not all seeds will germinate. *See infra* at 16.

[9] As RMA noted, "Kansas is an adjoining state to Colorado with similar climate, growing season, and topography." GFP Determination at 6 (AR01102). Publicly available mapping data shows that the address listed on RCR Farms' insurance application is approximately 60 miles from the Kansas border.

Determination at 6 (AR01102); *see also* AR00585 (opining that planting about 26,000 plants per acre "would not reduce yields when you are on the dry side, but would provide sufficient population to produce extra yield if you have above-average precipitation"); GFP Determination at 3 (AR01099) (quoting same).[10]

Although RCR Farms purchased insurance for irrigated corn, RMA noted that, even "[i]f irrigation is limited," the Kansas Corn Production Handbook provides that "the desired plant population may range from 24,000 to 28,000 plants per acre, depending primarily on soil type and amount of available water." GFP Determination at 3 (AR01099) (quoting AR01051). Because "[t]he plantings at a seeding rate of 22,500 would not qualify under a limited irrigation practice," the RMA determined that RCR Farms' seeding rate necessarily "cannot be considered adequate under a fully irrigated practice." GFP Determination at 4 (AR01100).

Because RCR Farms had "not established that planting [its] fields to an average of 22,500 plants per acre and in some cases planting as few as 15,000 plants per acre is adequate to reasonably expect to raise the yield upon which [RCR Farms'] guarantee is based," RMA determined that RCR Farms "failed to follow good farming practices for [its] planting population." GFP Determination at 6 (AR01102).

### B.  Applying herbicide more than a month after planting did not constitute good farming practices.

RMA also determined that RCR Farms failed to follow GFP with respect to weed control. GFP Determination at 6-7 (AR01102-03). RMA began by noting that RCR Farms

---

[10] The Nebraska panhandle, which was the subject area of this analysis, extends farther west than Bent County, Colorado, and the analysis notes that many producers in this region "will be faced with an uncertain water supply." AR00583.

"provided documentation to support a weed control measure applied in early July." *Id.* at 6 (AR01102); *see also id.* at 5 (AR01101) (table summarizing RCR Farms' herbicide purchases and applications). This was more than a month after RCR Farms finished planting its irrigated corn acres, which RMA determined was "too late for the critical period of weed control." *Id.* at 7(AR01103). RMA also found that RCR Farms "applied herbicide well after the maximum height for control of the weeds had been surpassed." *Id.*

In reaching these conclusions, RMA again pointed to the Kansas Corn Production, which explains the importance of controlling weeds throughout the corn's growth cycle due to the pound-for-pound trade-off between corn and weeds, *i.e.*, "every pound of weed dry matter in the producer's field comes at the expense of a pound of corn dry matter that could have grown there." GFP Determination at 6 (AR01102) (quoting AR01060); *see also id.* at 7 (AR01103). RMA also cited weed control guidance for the herbicides for which RCR Farms provided purchase records, which provided both the recommended application rate and the maximum recommended weed height at the time of application. *Id.* at 7, 9 (AR01101, 1103).[11]

RMA also relied on photographic evidence showing "heavy weed pressure *both* from "around the time [RCR Farms] applied [its] herbicide treatment," *i.e.*, at the time of NAU's site visit,[12] and "around harvest," *i.e.*, at the time of RMA's site visit. GFP Determination at 7 (AR01103). As reflected in NAU's photographs, a report submitted following its August 1,

---

[11] RMA noted that some records supplied by RCR Farms were for herbicides purchased in the name of RCR Farms' owner, personally. Nonetheless, RMA gave RCR Farms "credit for applying those herbicides to [its] Farms acres," but cautioned that if RCR Farms chose to appeal, it would have to supply information "to support [its] assertion that those herbicides were applied to RCR Farms acres . . . ." GFP Determination at 7 (AR01103).

[12] RCR Farms indicated that it applied herbicide on July 16, 2018. GFP Determination at 5 (AR01101). NAU's site visit occurred on August 1, 2018. *See, e.g.*, Pet. Br. at 5, 6.

2018 site visit states that "[t]here was some weed and grass pressure *in most of the fields* with *some fields having high weed and grass pressure*."  AR00416 (emphases added); *see also* AR0587-618 (NAU photographs).  RMA also documented heavy weed pressure during its site visit three weeks later, including "weeds in excess of six feet tall."  GFP Determination at 6 (AR01102); *see also* AR01755-2296 (RMA photographs).

Ultimately, RMA determined that "[e]ven if [RCR Farms'] herbicide treatment was successful in controlling the weeds, [its] application was too late to allow the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance."  GFP Determination at 6 (AR01102).  Accordingly, RMA found that RCR Farms "failed to follow a generally recognized good farming practice by failing to follow a recognized weed control program."  *Id.*

**VIII.  After reconsideration, RMA affirms the good farming practices determination.**

RCR Farms sought reconsideration of the GFP Determination.  AR01451-61.  And, through counsel, RCR Farms provided RMA with additional documentation and argument in support of its reconsideration request.  AR01494-99; AR01501-1754; *see also* AR01490-92 (email with additional information); AR01475-82; AR01483-88; AR01489, AR01493.

After a "thorough review" of all relevant information, including that submitted by RCR Farms, RMA again found that RCR Farms failed to follow good farming practices and upheld the GFP decision.  GFP Redetermination at 2 (AR01463).

    **A.  RMA concurs that planting fewer seeds on more acres while expecting less water was not consistent with GFP for irrigated corn.**

RMA began its reconsideration of the seed-population determination by addressing the seeding rates recommended by experts for irrigated corn.  RMA noted that both the Kansas

Corn Production Handbook and the Colorado Corn Guide recommend planting between 28,000 and 34,000 plants per acre (with a seeding rate of 5-10% higher, to account for germination or seeding losses).  GFP Redetermination at 3-4 (AR01464-65).  RMA also noted that, even in limited irrigation scenarios, the Kansas Corn Production Handbook recommends no fewer than 24,000 plants per acre.  *Id.* at 3 (AR01464).

Based on the seeding rate information provided by RCR Farms in support of its reconsideration request, RMA calculated that RCR Farms had used a "weighted average seeding rate of 17,822 seeds per acre."  *Id.* at 4 (AR01465).  (As noted, this was lower than the 22,500 plants per acre that RCR Farms initially claimed and for which RMA gave RCR Farms credit in rendering the original GFP determination.  *Supra* Part VII.A.)

RMA then compared RCR Farms' 2018 seeding rate with its 2017 seeding rate.  GFP Redetermination at 4 (AR01465).  In 2017, RCR Farms planted an average of 25,345 seeds per acre across 1,144.79 acres and had an average weighted yield of 158 bushels of corn per acre. *Id.* at 4-5 (AR01465-66); *see also* AR0117-50 (2017 seeding rates); AR01151-259 (2017 harvest data).[13]  In 2018, RCR Farms planted an average of 17,822 seeds per acre across more than 2,400 acres, and its insurance guarantees were based on an average yield of between 147-177 bushels of corn per acre.  GFP Redetermination at 4 (AR01465).  That is, in 2018, RCR Farms planted "30% less than was planted the previous year, expecting to raise better yields than the 'exceptionally good' 2017 [crop year].  *Id.*

---

[13] RCR Farms' target yield for 2017 was 200 bushels per acre.  GFP Redetermination at 5 (AR01466).

RMA further analyzed RCR Farms' yields based on bushels per 1,000 seeds planted. GFP Redetermination at 4-5 (AR01465-66).  In 2017, when RCR Farms planted an average of 25,345 seeds per acre, RCR Farms harvested an average of 6.27 bushels per 1,000 seeds planted (with yields ranging between 4.85-7.08 bushels per unit).  *Id.* at 5 (AR01466).  In 2018, when RCR Farms planted an average of 17,822 seeds per acre, RCR Farms set a target of 8-11 bushels per 1,000 seeds planted.  *Id.* at 4-5 (AR01465-66).  RMA noted that this target appeared to be based on an excerpt of an undated email from the seed company Syngenta with a chart showing the "Relationship between seeding rate and harvest yield for 1,002 Syngenta hybrid testing locations in Colorado, Kansas and Nebraska between 2016 and 2018."  GFP Redetermination at 4 (AR01465) (quoting AR01501).  However, RMA noted that this chart shows only four (out of 1,002) yield points in the 18,000-24,000 seeding-rate window, which are identified as "water limited"—RCR Farms insured irrigated corn—and further provides no explanation of what is deemed to be "limited" versus "fully irrigated."  GFP Redetermination at 4-5 (AR01465-66).

RMA also addressed the other letters submitted by RCR Farms in support of its reconsideration request.  *Id.* at 5 (AR01466).  RMA first noted Trey Brown, an agronomist from whom RCR Farms solicited letters, appears to be "contracted by RCR Farms LLC as a crop advisor."  *Id.* (AR01466); *see also* AR00287 (referring to what "we" did for corn planting).[14] RMA also pointed to a letter from Brian Lauristen, a crop consultant in the area.  GFP

---

[14] The GFP Handbook provides, among other qualifications, that if a purported expert "is not qualified to render an *objective*, *unbiased* opinion of the production methods, crop, or areas at issue, *the opinion cannot be considered* in the GFP decision or determination."  GFP Handbook § 22.A.b.iii (AR00061) (emphases added).

Redetermination at 5 (AR01466); *see also* AR00289-92 (letter).  But, RMA noted, the seeding-rate information relied on by Mr. Lauristen was inaccurate; Mr. Lauristen relied on RCR Farms' stated average population of 22,500 plants per acre, not its actual seeding rate of 17,822 seeds per acre.  GFP Redetermination at 5 (AR01466); *see also* AR00290-92.  Brad Walker, another area crop consultant, did not address RCR Farms' seeding rates, stating only generally that he believed that RCR Farms "made good management decisions."  AR00289.  As RMA noted, Mr. Walker's support was based at least in part on Mr. Lauristen's letter, which was in turn based on inaccurate seeding information.  GFP Redetermination at 5 (AR01466).  (None of the letters submitted by RCR Farms addressed RCR Farms' seeding rates on a "unit-by-unit" basis.)

After reviewing the relevant information, including expert publications and the materials submitted by RCR Farms, RMA concluded that RCR Farms did not follow GFP.  RMA noted that, even for limited irrigation situations, the lowest published recommendation is 24,000 corn plants per acre.  GFP Redetermination at 6 (AR01467).  RCR Farms used, on average, only 17,822 seeds per acre.  *Id.*  Even its highest seed-planting density, on unit 0001.0035, averaged only 21,736 seeds per acre.  *Id.*  Accordingly, RMA affirmed the determination that RCR Farms did not follow GFP because it did not plant enough corn to produce at least the yield used to determine the production guarantee.  *See id.*

## B.  RMA agrees that RCR Farms did not follow GFP in (not) controlling weeds.

On reconsideration, RMA summarized the materials submitted by RCR Farms in support of its claim that it followed GFP with respect to weed control.  Those materials included a list of herbicides available for use in 2018 and records indicating that RCR Farms conducted weed control measures for one unit.  GFP Redetermination at 6 (AR01467).  RMA also noted

18

that RCR Farms *stated* that it used herbicides to control weeds on areas with emergent corn but that RCR Farms does not keep individual spray records and has no records concerning the timing or application rates of chemicals on areas with emergent corn. *Id.*

RMA reiterated the "vital[ity]" of controlling weeds in the cornfield, based on the trade-off between weeds and corn. *Id.* (citing Kansas Corn Production Handbook). And RMA noted that both NAU's photographs (from August 1, 2018) and RMA's photographs (from August 22, 2018) showed weed pressure on RCR Farms' insured acres. *See id.*

Accordingly, RMA concluded that, "[b]ased on the photographic evidence and lack of records on weed control measures," RCR Farms "did not follow good farming practices in controlling weeds on [its] farms." GFP Redetermination at 6 (AR01467).

### C.  RMA's Reconsideration Determination is subject to judicial review

The RMA's Redetermination Decision is a final agency action subject to judicial review. *See* 7 C.F.R. § 400.98(f); *see also, e.g.*, *Sendra Corp. v. Magaw*, 111 F.3d 162, 167 (D.C. Cir. 1997) ("If for any reason [an] agency reopens a matter and, after reconsideration, issues a new and final order, that order is reviewable on its merits, even though the agency merely reaffirms its original decision.") (citing *I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 278 (1987)); *cf. Bhd. of Locomotive Eng'rs*, 482 U.S. at 285 (holding that "petitions for reconsideration that are actually filed . . . render[]the orders under reconsideration nonfinal").

### QUESTION PRESENTED

Whether RMA's GFP Redetermination decision finding that RCR Farms did not follow good farming practices with respect to seeding rates and weed control for its insured acreage of irrigated corn was arbitrary or capricious.

**STANDARD OF REVIEW**

A GFP determination may be reversed or modified only if it is found to be arbitrary or capricious.  7 U.S.C. § 1508(a)(3)(B)(iii)(II); 7 C.F.R. § 400.98(f).  It is Petitioner's burden to prove that the challenged agency action was arbitrary or capricious.  *See, e.g.*, *AllCare Home Health, Inc. v. Shalala*, 278 F.3d 1087, 1089 (10th Cir. 2001) ("The party challenging an agency action bears the burden of proving that it was arbitrary and capricious."); *Singh v. FCIC*, No. 1:17-cv-01373-SAB, 2018 WL 6831130, at *19 (E.D. Cal. Dec. 28, 2018) (holding that plaintiff challenging GFP determination "has not met his burden of demonstrating that [the FCIC] failed to consider the relevant factors in coming to its determination, or that the agency's decision runs counter to the evidence in the record").  As with other agency actions, the scope of the Court's review of a GFP determination is narrow and deferential to the agency, particularly on matters within the agency's area of expertise.  *Jagers v. FCIC*, 758 F.3d 1179, 1184 (10th Cir. 2014); *cf. Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").  The Court "confine[s] [its] review to ascertaining whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made." *Jagers*, 458 F.3d at 1184 (internal quotation omitted); *cf. American Colloid Co. v. Babbitt*, 145 F.3d 1152, 1154 (10th Cir. 1998) ("The court's function is exhausted where a rational basis is found for the agency action taken.") (internal quotation omitted).

## ARGUMENT

**I. RCR Farms has not demonstrated that the determination that it did not follow good farming practices on its insured Enterprise unit was arbitrary or capricious.**

### A. RMA properly analyzed GFP for Petitioner's insured Enterprise unit.

In analyzing whether RCR Farms had shown that it followed good farming practices, RMA appropriately looked to the Enterprise unit for which RCR Farms purchased insurance coverage and for which it declared a loss.

RCR Farms elected to insure its irrigated corn on an Enterprise unit basis. *Supra* Background Part II. An Enterprise unit is defined to include "all insurable acreage" of RCR Farms' irrigated corn. *Id.* By insuring all 2,498.56 acres of irrigated corn as an Enterprise unit, RCR Farms was able to receive a higher premium subsidy (and therefore pay less towards insurance premiums) than it would have if instead it had chosen to insure its irrigated corn on the basis of optional units. *See id.*

In keeping with its Enterprise unit policy, RCR Farms submitted a single notice of loss claiming a single cause of loss across the entire 2,498.56 acres of its insured Enterprise unit. *Supra* Background Part VI (citing AR00247). RCR Farms did not break down its notice of loss by field or optional unit, *see id.*; nor did it, for example, carve out those optional units from which it was able to harvest corn, *see infra* Argument Part II.B (citing evidence of same in the record, noting that the portion of loss attributable to Petitioner's failure to follow GFP is not at issue in this administrative appeal).

RCR Farms nonetheless argues that the GFP Determination was arbitrary and capricious because RMA did not "analyze whether RCR Farms followed GFP for the 2018 Corn Acres on a unit-by-unit basis." Pet. Br. at 14-15. Petitioner does not specify the "unit" level at which it

believes the GFP analysis should have been conducted but appears to be referring to "optional

units." *See supra* Background Part II (discussing same); *see also* AR00249-67 (RCR Farms

Summary of Coverage, identifying optional units by four-digit suffixes that follow the single,

four digit prefix—"0001"—identifying the single Enterprise unit for which RCR Farms

purchased insurance).[15]  RCR Farms argues that its 2018 Policy, the GFP Handbook, and the

GFP Bulletin, require this "unit-by-unit" analysis.  Pet. Br. at 15.  Petitioner is mistaken.

Petitioner cites to various sections of the Common Crop Insurance policy that refer to

production guarantees, coverage, and record-maintenance on a "unit" basis.  Pet. Br. at 15.  But,

as the Policy explains, there are various types of "Units" on the basis of which a producer may

elect to insure its crop.  *See* Common Corp Ins. Policy § 34 (AR00040-43) (titled "Units," and

setting forth the criteria for electing coverage on various unit bases); *see also id.* § 1 (AR00003-

08) (defining various types of units).  Here, Petitioner elected to insure a single Enterprise unit,

consisting of all 2,498.56 of its acres of irrigated corn in Bent County.

Petitioner also cites to an example from the GFP Handbook which it claims support its

contention that a "unit-by-unit" GFP determination is required.  Pet. Br. at 15.  However, the

policyholder in the example cited by Petitioner insured two separate units—one irrigated (like

Petitioner's corn), and one non-irrigated.  *See* GFP Handbook at 52 (AR00103).  Irrigated and

non-irrigated practices *cannot* be insured together as part of a single enterprise unit.  *See, e.g.*,

Common Crop. Ins. Policy § 34(a)(4)(viii) (AR00041); *see also id* at AR00002 (explaining that

---

[15] Even producers who elect Enterprise unit coverage maintain records on an optional-unit basis,
like RCR Farms does, including because changing "unit structure from enterprise units to basic
or optional units in any subsequent crop year," requires the producer to "maintain separate
records of acreage and production."  Common Crop Ins. Policy § 34(a)(4)(iv) (AR00041).

a policyholder may "select an enterprise unit for either irrigated or non-irrigated practice . . . "). Petitioner's error in relying on this example is illustrated by the two examples in the GFP Handbook that deal with policyholders who, like RCR Farms, insured their crops on an Enterprise unit basis.  Both of those examples reflect that RMA made a single GFP determination with respect to the insured's Enterprise unit and did not look to see whether GFP were followed on any individual optional unit for which the insured kept records.  *See* GFP Handbook at 55-58 (AR00106-09) (providing example of holder of non-irrigated corn insurance policy who elected to insure 500 acres across two units on an "Enterprise Unit" basis, and concluding, *inter alia*, that policyholder did not purchase enough seeds to plant the recommended seeds per acre and therefore did not follow GFP); *id.* at 59-61 (AR00110-12) (providing example of holder of tobacco crop insurance policy who elected to insure five units on an Enterprise Unit basis and concluding that holder failed to follow GFP, with not separate analysis of each of the five units comprising the Enterprise Unit).

Finally, Petitioner cites to the GFP Bulletin, which states that GFP determinations will determine whether "the producer followed GFP for the insured unit in question."  Pet. Br. at 16 (citing GFP Bulletin at 1).  Here, the "insured unit in question" is the Enterprise unit for which RCR Farms purchased crop insurance reinsured by the FCIC.

Petitioner cites to no authority, and nothing in the record, suggesting—much less demonstrating—that RMA must make a GFP determination on the basis of any "unit" other than the type of unit that the policyholder elects to insure.  Here, Petitioner chose to insure all

2,498.56 acres of irrigated corn on an Enterprise unit basis, and RMA appropriately made the determination that RCR Farms failed to follow GFP for irrigated corn on its Enterprise unit.[16]

### B. What portion of RCR Farms' loss is attributable to its failure to follow GFP is not before the Court.

To the extent that Petitioner is arguing that some of its claimed losses may not be attributable to its failure to follow GFP on certain optional units, *see e.g.* Pet Br. at 15 (arguing, *inter alia*, that "just as a farmer may experience a loss on some units but not others, a farmer could also follow GFP on some units, but not others," and that a unit-by-unit breakdown is necessary "to ensure that a loss claim is adjusted properly"), those arguments are not properly before the Court in this case.  In the GFP determinations, RMA did not consider whether an insurable cause of loss had occurred, *see* GFP Determination at 1, 7 (AR01097, 103); GFP Redetermination at 1 (AR01462), and RMA explained that "[t]he determination of what portion of [RCR Farms'] loss was due to [its] failure to follow good farming practices will be made as part of [RCR Farms'] large claim determination," GFP Determination at 7 (AR01103).  The outcome of RCR Farms' large claim determination—including what portion of RCR Farms' loss was due to its failure to follow good farming practices—is not at issue in this administrative appeal of the GFP determination.  The amount of insurance indemnity to which RCR Farms

---

[16] Although not required to do so, RMA did in fact address RCR Farms' practices on a "unit-by-unit basis to render [its] reconsideration determination."  GFP Redetermination at 3 (A01464). RMA was able to do so after RCR Farms provided seeding-rate information on an optional-unit basis in support of its reconsideration request.  As discussed below, that "unit-by-unit" analysis did not change the outcome, as RCR Farms failed to follow GFP with respect to seeding rates on any unit, because even its highest optional-unit seeding rate was below that recommended by experts for irrigated corn.  *Infra* Part II.  RCR Farms does not keep unit-specific herbicide records that might have allowed RMA to make the weed-control determination on the "unit-by-unit" basis RCR Farms argues was required, and, in any event, the only records RCR Farms did keep showed that it applied weed control measures too late to be effective.  *Infra* Part III.

may ultimately be entitled—and with it any arguments concerning losses not being attributable

to its failure to follow GFP (at all or on certain optional units), or the amount of irrigated corn

Petitioner was ultimately able to harvest and sell from its Enterprise unit, *see, e.g.*, AR00417-22

(reflecting corn production); AR00456-63 (sale records)—are not part of this case.

## II. RCR Farms has not demonstrated that the GFP Determination with respect to its seed population was arbitrary or capricious.

RMA determined that RCR Farms did not follow good farming practices because the

amount of corn that it planted was insufficient to produce at least the yield used to determine its

production guarantee. *Supra* Background Parts VII.A, VIII.A.  RCR Farms contends that this

was arbitrary or capricious on various grounds, none of which merits reversal.

First, RCR Farms argues that its seeding rate was "consistent with" an undated email

from Andy Heggenstaller, the Head of Agronomy, US Seed, for Syngenta, which owns one of

the seed varieties planted by RCR Farms.  Pet. Br. at 22.  There are several problems with RCR

Farms' reliance on this email.  To begin with, it is not clear that Mr. Heggenstaller qualifies as

an approved agricultural expert, *see, e.g.*, GFP Handbook § 21.A-B (AR00059-60) (requiring

and discussing requirements for same), and his undated email is not on letterhead or

accompanied by any evidence of expert certification, *see id.* § 22.A.2.b.i (AR00061) (requiring

same).  Nor is it clear, given RCR Farms' status as a customer, whether Mr. Heggenstaller

would be "qualified to render an *objective, unbiased opinion* of the production methods, crop,

or areas at issue," which would mean that his "opinion cannot be considered in the GFP

decision or determination."  GFP Handbook § 22.A.2.b.iii (AR00061) (emphasis added).

But, setting those problems aside, Mr. Heggenstaller's email actually confirms what

RMA found, namely that a higher planting population—28,000-36,000 seeds per acre—is

desirable for "fully irrigated" locations.  AR01501.  Here, RCR Farms insured its corn under an "irrigated" practice, and it could claim as irrigated—and receive insurance coverage for—only those acres for which RCR Farms "had a reasonable expectation of receiving adequate water at the time coverage begins."  Common Crop Ins. Policy § 9(b) (AR00021).  Where, as here, a producer "knew or had reason to know that [its] water may be reduced before coverage begins, no reasonable expectation exists."  *Id.*  As RCR Farms argues, it knew prior to planting that its water "may be reduced" for 2018.  *See supra* Background Part III.  Because RCR Farms insured its corn acres under an irrigated practice, RMA appropriately considered recommended seeding rates, including those recommended by Mr. Heggenstaller and Syngenta, for "irrigated" corn.

But, even if Mr. Heggenstaller's opinion that a lower planting population may have been appropriate for a "limited irrigation" practice were relevant in determining whether RCR Farms followed GFP for "irrigated" corn, it is of no help to RCR Farms here.  Mr. Heggenstaller's email states that, for "locations with limited irrigation," "Syngenta trial data shows an ideal planting population range of 18,000-24,000 seeds/acre."  AR01501.  RCR Farms' actual seeding rate of 17,822 seeds per acre was below even the minimum of 18,000 seeds per acre Mr. Heggensaller states would be recommended for limited-irrigation situations.

Second, RCR Farms contends that RMA erred in relying on the Kansas Corn Production Handbook because it is not sufficiently location specific.  Pet. Br. 22-23.  But RMA is entitled to rely on experts (and expert publications) that address the specific insured crop—irrigated corn—"for the area" in determining whether a producer followed GFP.  Common Crop Ins. Policy § 1 (AR00005); *see also* GFP Handbook § 22.A.2.a (AR00061) (providing for consideration of "[p]ublished material" from experts); GFP Bulletin § I.B.2.a (same).  "Area" is

defined as "[l]and surrounding the insured acreage with geographic characteristics, topography, soil types and climatic conditions similar to the insured acreage."  Common Crop Ins. Policy § 1 (AR00004).  As RMA noted, "Kansas is an adjoining state to Colorado with similar climate, growing season, and topography."  GFP Determination at 6 (AR01102).  RCR Farms cites to no record evidence that the conditions in Bent County are so *dissimilar* from those in Kansas to render RMA's reliance on the Kansas Corn Production Handbook erroneous.  (In addition to the Kansas Corn Production Handbook, RMA also relied on seeding recommendations in publications from experts in Colorado and western Nebraska.  *See* GFP Redetermination at 3-5 (AR01464-66).  As with Kansas, Petitioner has not presented any evidence that the conditions in Colorado or western Nebraska are too dissimilar to be reasonably relied upon.)

As the Eastern District of California explained in rejecting a similar argument to the one that Petitioner makes here:

> Plaintiff does not point to any evidence *in the record* establishing the dissimilarity of Mountain House from other areas in the San Joaquin Valley. Plaintiff does not, for example, point in the record to differences in topography, annual rainfall, soil composition, or climate—something, which if established, might have stood as basis for finding the decision of the RMA to be arbitrary. Plaintiff merely argues his *ipse dixit* that the conditions are dissimilar. Accordingly, the court finds that plaintiff has not satisfied *his* burden of establishing facts that the opinions relied upon by defendant were [not] [*sic*] from agricultural experts for the area.

*Noceti v. USDA*, No. 2:14-cv-01177-KJM-GGH, 2016 WL 304621, at *4 (E.D. Cal. Jan. 26, 2016), *adopted by* 2016 WL 4046978 (E.D. Cal. Mar. 22, 2016).  Notably, the Syngenta research in the email on which RCR Farms primarily relies in arguing that its seeding rates were appropriate is based on "*testing locations in Colorado, Kansas and Nebraska*."  AR01501.  RCR Farms has not shown that it was arbitrary or capricious for RMA to rely on seeding rates in expert publications from Kansas (or Colorado or Nebraska).

Finally, in a hybrid of the first two arguments, RCR Farms contends that RMA's use of "recommended" seeding rates was erroneous.  Pet Br. at 23-24.  The seeding rates on which RMA relied, however, were "recommended" *by experts in publications*, and the Common Crop Insurance Policy and the GFP Handbook both contemplate and countenance RMA's reliance on expert publications.  *Supra* at 27.  Indeed, even Mr. Heggenstaller's email is based on "recommended seeding rate[s]," AR01501, and does not analyze RCR Farms' actual seeding rates.  While RMA presumably *could* have hired an expert to opine on RCR Farms' specific seeding rates, RCR Farms points to no requirement (there is none), that RMA must spend federal funds for such an individualized expert analysis to determine whether RCR Farms is entitled to federally funded indemnification for its failed planting decisions, particularly where, as here, expert publications address recommended seeding rates for irrigated corn in the area.

*At most*, RCR Farms has shown that its "experts" disagree that its decision to plant less corn spread across more acres, knowing that it would be receiving less water, was not consistent with GFP.  But it is well-established that disagreement among experts is not grounds to overturn an agency decision.  *See, e.g.*, *Marsh v. Ore. Natural Resources Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1036 (10th Cir. 2001) (holding that, when faced with "disagreement over scientific opinions and conclusions," courts "cannot displace the agencies' choice between two conflicting views, even if we would have made a different choice had the matter been before us de novo"); *cf. Jagers*, 758 F.3d at 1882-83, 1184-85 (affirming, as a product of agency expertise, an RMA GFP

28

determination that corn farmers in Baca County, Colorado, failed to follow GFP based, *inter alia*, on RMA's consideration of scientific evidence relating to various types of farming practices, including those discussed in sources from western Kansas and eastern Colorado). The GFP Bulletin is consistent with this precedent and provides that a production method will not be considered to comply with GFP if, among other things, "there is a genuine dispute . . . *between an agricultural expert and the published materials* and the AIP cannot confirm that the practice in question is a GFP."  GFP Bulletin at 5 (emphasis added).

Petitioner's "unit-by-unit" arguments are addressed above.  *Supra* Part I.  But, even if an optional unit-by-optional unit analysis of RCR Farms' seeding levels were required, Petitioner still has not shown that the GFP Redetermination (or Determination) was arbitrary or capricious.  In seeking reconsideration, RCR Farms provided RMA with its seeding rates for each optional unit.  *See* Pet. Br. at 20.  And RMA considered that information in rendering its decision, *see* GFP Redetermination at 4-5 (AR01465-66), and "reviewed each concern, position, and the supporting evidence on a unit-by-unit basis to render [its] reconsideration determination," *id.* at 3 (AR0164).  As RMA noted, the information provided by RCR Farms showed that *none* of its optional units had been planted with the minimum number of corn plants recommended for even a water-limited practice, GFP Redetermination at 6 (AR01467) (noting that "[e]ven [RCR Farms'] highest seed planting density averaged only 21,736 seeds per acre on unit 0001.0035"), and therefore necessarily fell short of the minimum number of plants recommended for the irrigated basis on which Petitioner insured its crop, *see id.*  Notably, for all its protestations that a unit-by-unit analysis was required, Petitioner makes no showing that it *did* follow GFP if only its practices were examined on an optional-unit-by-optional-unit basis,

arguing instead (and relying on "experts" who suggest) that applying reduced seeding rates was appropriate across its insured acres.  *See generally* Pet. Br.; *see also* AR01501 (email from Syngenta with no unit-by-unit analysis of RCR Farms' seeding rates); AR00287, AR01500 (letters from RCR Farms' crop consultant with no unit-by-unit analysis of RCR Farms' seeding rates); AR00288 (letter from area crop consultant with no unit-by-unit analysis, or indeed any mention, of RCR Farms' seeding rates); AR00290-92 (letter from area crop consultant with no unit-by-unit analysis of RCR Farms' seeding rates, expressly noting reliance on RCR Farms' "stated average" seeding population).

Petitioner has not demonstrated that the GFP determination with respect to its seeding rates was arbitrary or capricious.

### III. RCR Farms has not demonstrated that RMA's weed-control determination was arbitrary or capricious.

RMA found that RCR Farms failed to follow good farming practices with respect to weed control because it applied herbicide "too late for the critical period of weed control" and "well after the maximum height for control of the weeds had been surpassed."  GFP Determination at 7 (AR01103); *see also id.* ("Even if [RCR Farms'] herbicide treatment was successful in controlling the weeds, [its] application was too late to allow the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee . . . .").  RMA affirmed this determination on reconsideration, adding that RCR Farms had not produced "records on weed control measures" to show that it followed good farming practices.  GRP Redetermination at 6 (AR01467).

RCR Farms argues that these determinations were arbitrary or capricious because they relied on photographs taken by RMA during its August 22, 2018 inspection of RCR Farms'

fields.  Pet. Br. at 24-26.  This argument is based on a mistaken premise, and it fails to show that the agency decision was arbitrary or capricious in any event.

First, neither the GFP Determination nor Redetermination relied exclusively on photographs taken by RMA on August 22, 2018.  Rather, both expressly noted that they had also taken into account the photographs taken by NAU three weeks earlier.  In the GFP Determination, RMA found that "[t]he photographic evidence shows ***both*** heavy weed pressure [1] *around the time you applied your herbicide treatment* as well as [2] *continued heavy weed pressure around harvest*."  GFP Determination at 7 (AR01103) (emphases added).[17]  And, on reconsideration, RMA likewise cited *both* sets of photographs "show[ing] weed pressure on [RCR Farms'] insured acreage."  GFP Redetermination at 6 (AR01467).

Second, contrary to Petitioner's repeated assertions, the NAU photographs showed, and the NAU adjuster observed, weed pressure in *most of RCR Farms' cornfields* as early as August 1, 2018.  Petitioner represents the contents of NAU's report as having noted only "some weeds, including 'some fields' with weed pressure."  Pet. Br. at 6.  In fact, the NAU report stated that, as of August 1, 2018, "[t]here was some weed and grass pressure *in most of the fields* with *some fields having high weed and grass pressure*."  AR00416 (emphases added).

Third, photographs were not the only evidence on which RMA relied in finding that RCR Farms failed to follow good farming practices with respect to weed control.  In particular, RMA found that RCR Farms "applied herbicide to [its] fields too late for the critical period of weed control."  GFP Determination at 7 (AR01103).  Accordingly, RMA determined that

---

[17] As noted, the first and only application of herbicide for which RCR Farms produced records came approximately two weeks before the NAU adjuster's visit.  *Supra* Background Part VI & note 12.

"*[e]ven if* [RCR Farms'] herbicide treatment was successful in controlling the weeds, [its] application was too late to allow the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee . . . ." *Id.* (emphasis added); *see also* Redetermination at 3, 6 (AR01464, 67) (recounting evidence and affirming decision). RCR Farms does not challenge this determination.

Nor did RCR Farms address its obligation to maintain records demonstrating that it followed GFP and was therefore eligible for federally subsidized crop insurance. As the RMA noted on reconsideration, it agreed that RCR Farms did not follow good farming practices in controlling weeds on its acreage of irrigated corn, in part, because of "lack of records on weed control measures." GFP Redetermination at 6 (AR01467); *see also id.* ("Your client stated that RCR Farms, LLC does not keep individual spray records. . . . No records were provided regarding the timing or application rates of these chemicals [that RCR Farms claimed to have used on areas with emergent corn].").

Petitioner also argues that the weed-control determination is arbitrary and capricious because the photographs taken by RMA during its August 22, 2018 site visit lack certain identifying information, such as date, time, and location. Pet. Br. at 26. This argument, too, is based on a mistaken premise.

First, the information that Petitioner claims is missing is in fact included in the native photo (.jpg) files that were before the agency. In converting the .jpg files to .pdf so that they could be filed with the Court, the metadata containing the identifying information did not transfer to the resultant .pdf files. An example the .jpg file "properties" from one of the RMA photographs showing this information is attached as Exhibit A. (Depending on the program

used to view .jpg files, the identifying information appears in different formats, as reflected in the exhibit.)  The undersigned informed Petitioner's counsel that the purportedly missing information was included in the record before the agency, provided a sample .jpg file, and offered to provide to counsel and/or supplement the record with the native .jpgs of all photos taken by RMA during its August 22, 2018 site visit.  Petitioner's counsel stated that this was not necessary.[18]

The native .jpg files before RMA included the identifying information that Petitioner avers was missing, and in any event, Petitioner has not shown that the agency "failed to consider an important aspect" of RCR Farms' inadequate application of weed-control measures. *Jagers*, 758 F.3d at 1184 (internal quotation omitted).  Indeed, even if the identifying information had not been provided, the only "authority" cited by Petitioner does not support its argument that this would be sufficient grounds for reversal.  Petitioner cites to an example from the GFP Handbook, but in that example the RMA rejected the AIP's GFP decision letter due to numerous other factors, including "the lack [of] any supporting documentation, the fact that the request file did not include any adjuster field notes or statement of fact documenting findings and observations of field inspections, . . . [and the absence of any] analysis of the actions taken by the Policyholder compared against what agricultural experts or published material require." GFP Handbook at 63 (AR00014); *see also id.* (explaining that "[t]he AIP GFP Decision Letter did not include or reference any published materials, written opinion or recommendation of any agricultural expert to support denial of the claim").  None of those factors is present here.

---

[18] If the Court wishes to see some or all of the native .jpg files, Respondent can submit a DVD with the files to the Court (and Petitioner's counsel).

Second, not only was the identifying information included in the record before the agency, but Petitioner does not (and could not credibly) argue that it is in fact *unaware* of where and when the photographs were taken or what they depict—RCR Farms' cornfields.  Petitioner argues that the GFP Determination was arbitrary and capricious because the photographs "fail to provide information regarding the date/time the photographs were taken," Pet. Br. at 26, but acknowledges that "the photographs [were] taken during the [RMA's] August 22 inspection," *id.* at 8.  And Petitioner does not claim that it is does not actually know "the location(s) . . . or the subject matter depicted," *id.* at 26, in photographs of *RCR Farms* taken on a site visit at which RCR Farms' owner was present.  *See, e.g.*, AR02081 (picturing RCR Farms' owner with an RMA employee during the site visit).

Finally, Petitioner is not—because of the photographs or otherwise—"forced to guess regarding how RMA analyzed the weed control issues for each unit."  Pet. Br. at 26.  RMA explained that RCR Farms failed to apply herbicide to *any* of its corn until it was too late to allow the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee, GFP Determination at 7 (AR01103), and RCR Farms did not provide RMA with any records showing otherwise, *see* GFP Redetermination at 6 (AR01467).  Accordingly, Petitioner's complaint that RMA should have provided a "detailed unit-by-unit breakdown of the Weed Control Determination" is not well taken.  *See supra* Argument Part I. (addressing Petitioner's "unit-by-unit" argument).  It was RCR Farms' obligation to establish that it followed GFP and to maintain adequate records showing that it had done so.  But RCR Farms did not "keep individual spray records" and provided no records "regarding the timing or application rates of" herbicides, and its "lack of records on weed

34

control measures" was an additional basis on which RMA affirmed the GFP Determination. GFP Redetermination at 6 (AR01467).[19]

Petitioner has not demonstrated that the GFP Redetermination or Determination with respect to weed control was arbitrary or capricious.

## CONCLUSION

For the foregoing reasons, RCR Farms has not demonstrated that the determination that it failed to follow good farming practices for irrigated corn was arbitrary or capricious. RCR Farms' petition should denied, and this case should be dismissed with prejudice. Respectfully submitted this 27th day of January 2021.

JASON R. DUNN
United States Attorney

*s/ Ian J. Kellogg*
Ian J. Kellogg
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Ste. 1600
Denver, CO  80202
Telephone: 303-454-0278
E-mail: ian.kellogg@usdoj.gov

Counsel for Respondent

---

[19] Petitioner also argues that the weed-control determination ignores conditions, including heavy August rains and NAU's purported release of the fields, that provide "an alternate explanation" for the weed-pressure observed by RMA on August 22, 2018.  Pet. Br. at 25.  But the possibility than an "alternate explanation" may exist is not grounds to overturn agency action as arbitrary or capricious.  *See supra* at 28-29.  And Petitioner's alternate explanation ignores the weed pressure observed by NAU on August 1, RCR Farms' lack of records, and RMA's determination that RCR Farms applied herbicide too late in the growing season to be effective.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

jeff.todd@mcafeetaft.com

*s/ Ian Kellogg*
Office of the U.S. Attorney