IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01602-REB

RCR Farms, LLC,

    Petitioner,

v.

FEDERAL CROP INSURANCE CORPORATION,

    Respondent.

---

**REPLY BRIEF**

---

Jeff L. Todd
Jeremiah L. Buettner
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102-7103
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
Email: jeff.todd@mcafeetaft.com
       jeremiah.buettner@mcafeetaft.com

**Attorneys for Petitioner,
RCR Farms, LLC**

February 11, 2021

Petitioner, RCR Farms, LLC ("RCR Farms"), responds as follows to the Response Brief of Respondent, Federal Crop Insurance Corporation ("FCIC"):

**I.  RCR Farms' decision to insure the 2018 Corn Acres as an Enterprise Unit did not excuse RMA from the obligation to analyze whether RCR Farms employed GFP on a unit-by-unit basis.**

In its Response Brief, FCIC argues RMA was not required to analyze whether RCR Farms followed GFP on a unit-by-unit basis because RCR Farms insured the 2018 Corn Acres as an Enterprise Unit. According to RMA, RCR Farms decision to insure the 2018 Corn Acres as an Enterprise Unit allowed RMA to perform its GFP analysis at the Enterprise Unit level and issue a blanket determination for the entire Enterprise Unit. This position is plainly inconsistent with the Common Crop Insurance Policy.

The Common Crop Insurance Policy specifically contemplates that, "[i]n order to qualify, an enterprise unit must contain all of the insurable acreage of the same insured crop in:

 (A) Two or more sections, if sections are the basis for <u>optional units</u> where the insured acreage is located;

 (B) Two or more section equivalents determined in accordance with FCIC issued procedures, if section equivalents are the basis for <u>optional units</u> where the insured acreage is located or are applicable to the insured acreage;

 (C) Two or more FSA farm numbers, if FSA farm numbers are the basis for <u>optional units</u> where the insured acreage is located;

 (D) Any combination of two or more sections, section equivalents, or FSA farm numbers, if more than one of these are the basis for <u>optional units</u> where the acreage is located or are applicable to the insured acreage . . .; or

 (E) One section, section equivalent, or FSA farm number that contains at least 660 planted acres of the insured crop. You may qualify under this paragraph based only on the type of parcel that is utilized to establish <u>optional units</u> where your insured acreage is located . . . .

(Basic Provisions § 34(a)(4)(i) (emphasis added)). By definition, an Enterprise Unit must be comprised of either (1) two or more optional units or (2) a single optional unit containing at least

660 planted acres. It is for this very reason that when the NAU adjusters adjusted RCR Farms' loss claim for the 2018 Corn Acres, they did so on a unit-by-unit basis (i.e., for each of the 10 optional units that make up RCR Farms Enterprise Unit). (*See* NAU Specialist Report, AR 415-422). While it is true the loss claim for an Enterprise Unit is based on the total acreage and total production, the adjusters are still required to evaluate each optional unit in order to adjust the loss claim for the entire Enterprise Unit. Similarly, in order to determine whether a producer followed GFP, RMA is required to analyze the farming practices utilized on each of the optional units that make up the Enterprise Unit. Any other result would allow RMA to negate a loss claim for an entire Enterprise Unit based solely on a producer's failure to follow GFP with respect to a single optional unit.

The two example GFP cases from the GFP Handbook relied on by FCIC in its Response Brief support the unit-by-unit requirement. Consider the second example GFP case. There, the hypothetical producer insured two units—Unit 001 and 002—as an Enterprise Unit. (GFP Handbook, AR 106). In determining that the hypothetical producer from the second example GFP case failed to follow GFP (by failing to apply fertilizer), it was specifically noted that "[a]ll units were sprayed with herbicide 45 days after the reported plaint dated." (GFP Handbook, AR 108 (emphasis added). Thus, even the second example GFP case makes clear that the GFP analysis was performed on a unit-by-unit basis. The same conclusion is supported by the third example GFP case. That case involved a hypothetical producer whose Enterprise Unit "was comprised of 5 units." (AR 110). There too, the analysis looked at the hypothetical producer's farming practices on individual fields to determine whether the producer followed GFP. (AR 112 ("The reason stated for not timely harvesting and removing all the marketable leaves on some fields was due to the tobacco in those fields being less desirable, and that the soil was too wet.") (emphasis added)).

2

Accordingly, even where a producer insures multiple units as an Enterprise Unit, the GFP Handbook instructs that the analysis of whether the producer followed GFP be performed on a unit-by-unit basis. There is simply no support for FCIC's position that RCR Farms' Enterprise Unit election permitted RMA to issue a blanket GFP Determination for the entire Enterprise Unit without analyzing the component optional units on an individual basis.

To cover all its bases, FCIC also claims that "RMA did in fact address RCR Farms' practices on a "unit-by-unit basis to render [its] reconsideration determination." (Response Brief at 24, n. 16 (citing page 3 of the GFP Reconsideration Determination)). FCIC appears to be relying on the conclusory statement found at page 3 of the GFP Reconsideration Determination that "RMA reviewed each concern, position, and the supporting evidence on a unit-by-unit basis to render this reconsideration determination." (GFP Reconsideration Determination, AR 1464). There is no doubt that RMA claims to have performed a unit-by-unit analysis in the GFP Reconsideration Determination, but a review of the remainder of the GFP Reconsideration Determination reveals that there is no support for this claim. (GFP Reconsideration Determination, AR 1462-1470). If RMA did perform a unit-by-unit analysis, it should have included that analysis in the Reconsideration Determination. The GFP Handbook simply does not allow RMA to issue a GFP determination based on a secret unit-by-unit analysis. (*See* GFP Handbook, AR 68 (noting a GFP Decision Letter must "state why the production method does or does not meet the requirements [for GFP]")). FCIC's argument on this point is refuted later in the Response Brief when it admits RMA did not perform the individualized analysis required by the Common Crop Insurance Policy, the GFP Handbook, and the GFP Bulletin. (*See* Response Brief at 28 ("While RMA presumably *could* have hired an expert to opine on RCR Farms' specific seeding rates, RCR Farms points to

no requirement . . . that RMA must spend federal funds for such an individualized expert analysis. . . ." (emphasis in original)).

As is set forth in detail in RCR Farms' opening brief, the Common Crop Insurance Policy, GFP Handbook, and GFP Bulletin all support the conclusion that RMA was required to analyze each of the optional units that comprise RCR Farms' Enterprise Unit in rendering its GFP Determination. RMA's failure to do so violated its own rules and guidance and the *Accardi* doctrine. Accordingly, the GFP Determination is arbitrary and capricious and should be set aside in its entirety.

**II.     RCR Farms' Petition for Judicial Review does not concern the portion of loss attributable to RCR Farms' alleged failure to follow GFP—it concerns RMA's failure to follow its own rules and guidance concerning GFP Determination.**

FCIC erroneously claims that RCR Farms is contesting the amount of loss attributable to RCR Farms' alleged failure to follow GFP. This is a misreading of RCR Farms' argument. The only determination at issue in this Petition for Judicial Review is RMA's GFP Determination. More specifically—whether RMA was required to analyze whether RCR Farms followed GFP on a unit-by-unit basis and whether RMA's Seed Population Determination and Weed Control Determination was arbitrary and capricious. Indeed, there has been no need for RCR Farms to argue how much of its loss is attributable to alleged failure to follow GFP because RMA denied RCR Farms' entire loss claim on the basis of the GFP Determination.

If the Court rules that RMA acted arbitrarily and capriciously, the GFP Determination must be reversed (in whole, or in part) so that RMA can perform a GFP analysis that complies with the Common Crop Insurance Policy, the GFP Handbook, and the GFP Bulletin. Only after RMA issues a proper GFP Determination will it be possible to determine how much of RCR Farms' loss resulted from an insurable cause of loss versus the alleged failure to follow GFP. The entire

4

purpose of RCR Farms' Petition for Judicial Review is to compel RMA to properly analyze the alleged GFP issues on a unit-by-unit basis so that RMA Farms will not be subjected to an improper blanket GFP determination.

**III.     The expert guidance cited by RCR Farms and FCIC supports the conclusion that the Seed Control Determination was arbitrary and capricious.**

In support of the Seed Population Determination, FCIC first assails the letter from Andy Heggenstaller, Head of Agronomy, US Seeds, Syngenta. FCIC first complains that Mr. Heggenstaller's letter—which directly undermines RMA's reliance on a blanket, recommended seed population figure—was "not on letterhead or accompanied by any evidence of expert certification." (Response Brief at 25). FCIC's argument on this point is misguided. To begin, while Mr. Heggenstaller's letter did not include official Syngenta letterhead, it did clearly contain his official Syngenta signature block. (Syngenta Seeding Rate Letter, AR 1501). Mr. Heggenstaller's signature block identifies his position and affiliation with Syngenta in the same manner as letterhead. Moreover, the GFP Handbook does not require "evidence of expert certification" as represented by FCIC. Instead, it states that "[a]n agricultural expert who provides a written opinion or recommendation on farming practices should submit it on letterhead or include evidence of their certification, as appropriate." (GFP Handbook, AR 61). Mr. Heggenstaller's signature block is more than sufficient to comply with the requirement of the GFP Handbook—it identifies his affiliation with Syngenta and provides evidence of his certification. Further, a simple google search by FCIC or RMA would have confirmed the certification stated in Mr. Heggenstaller's letter.[1] Finally, to the extent FCIC is claiming the opinions contained in Mr. Heggenstaller's letter were

---

[1] The top result for a Google search of "Andy Heggenstaller" is Mr. Heggenstaller's LinkedIn page, which confirms his position and qualifications. (e.g., Head of Agronomy, US Seeds at Syngenta).

5

improper influenced by bias due to the fact that RCR Farms uses the Syngenta Golden Harvest Seed Variety, FCIC has provided no evidence whatsoever to support this claim.

Moreover, FCIC's claim that Mr. Heggenstaller's letter supports the GFP Determination is simply not true. His letter clearly states that "Syngenta trial data shows an ideal planting population range of 18,000-24,000 seeds/acre for locations with limited irrigation" and "[o]ptimum plant populations should always account for yield environment, with reduced populations recommended for fields like those managed by RCR Farms, which have an average APH below 150 bu/acre." (Syngenta Seeding Rate Letter, AR 1501). In addition, the data chart provided in Mr. Heggenstaller's letter shows the support for his claims:



(Syngenta Seeding Rate Letter, AR 1501). FCIC's argument that RCR Farms was not justified because it knew or should have known it would not have adequate water ignores the record in this case. Throughout this GFP appeal process, RCR Farms has repeatedly made clear that it carefully analyzed the amount of water that would be available for irrigation and determined that sufficient

6

water was available to meet the yields used to determine its production guarantee if it utilized reduced seed population rates. (Opening Brief at 3)

FCIC's reference to "RCR Farm's actual seeding rate of 17,822 seed per acre" further Supports RCR Farms' claim that the Seed Population Determination was arbitrary and capricious. The 17,822 seeds per acre figure cited by FCIC is the <u>average seeding rate</u> for the 2018 Corn Acres. By referencing the average seeding rate, FCIC confirms that RMA did not analyze the actual seeding rates employed by RCR Farms for each optional unit. Instead, RMA simply calculated a simple average seeding rate, compared it to an arbitrary recommended seeding rate, and determined that RCR Farms failed to follow GFP because the simple average seeding rate for the 2018 Corn Acres was below the arbitrary recommended seeding rate. Had RMA performed an individualized analysis of RCR Farms' seeding rates, it would have reviewed the following data:

| Unit | Seeding Rate Range | Target Yield Range Based on Crop Quest Analysis |
|---|---|---|
| 0001-0019 | 13,500-18,500 plants/acre | 164.61-182.25 bu/acre |
| 0001-0020 | 17,543.37 plants/acre (avg. for entire optional unit) | 175.4-192.5 bu/acre |
| 0001-0021 | 14,500-18,000 plants/acre | 143.7-159.9 bu/acre |
| 0001-0025 | 13,000-18,000 plants/acre | 158.09-175.46 bu/acre |
| 0001-0026 | 13,000-18,000 plants/acre | 145.70-162.12 bu/acre |
| 0001-0029 | 18,000 plants/acre | 165.7-183.7 bu/acre |
| 0001-0030 | 18,000 plants/acre | 164.93-182.91 bu/acre |
| 0001-0031 | 13,500-18,000 plants/acre | 162.8-180.37 bu/acre |
| 0001-0035 | 12,500-24,000 plants/acre | 209.39-251.78 bu/acre |
| 0001-0036 | 12,500-18,000 plants/acre | 157.5-175.1 bu/acre |

(AR 1718-1754). RMA's failure to analyze the seeding rates employed by RCR Farms contravened the requirement of the Common Crop Insurance Policy, the GFP Handbook, and the GFP Bulletin that RMA analyze GFP on a unit-by-unit basis.

FCIC's Response Brief also doubles down on RMA's reliance on the recommended seeding rate for irrigated corn contained in the Kansas Corn Production Handbook (the "Kansas Handbook"). (Response Brief at 26-27). A review of the Kansas Handbook illustrates why RMA's reliance on this recommended seeding rate was improper. Page 12 of the Kansas Handbook states that the recommended plant population for limited irrigation corn in Kansas "may range from 24,000 to 28,000 plants per acre." (Kansas Handbook, AR 1051). But, the Kansas Handbook also states that the "[o]ptimum plant population depend on the yields a particular environment will permit." (Kansas Handbook, AR 1051). Despite this clear guidance from the Kansas Handbook to consider the yields a particular environment will permit, the GFP Determination fails to analyze the particular environment of the 2018 Corn Acres (i.e., Bent County, Colorado, in 2018). (*See* GFP Determination 1097-1105). Instead, RMA mechanically applied the recommended seeding rate for irrigated Kansas corn to the limited irrigation 2018 Corn Acres. (GFP Determination, AR 1100). RMA's failure to consider the relevant differences between irrigated Kansas corn and limited irrigation Colorado corn, and other yield-specific circumstances associated with the 2018 Corn Acres, supports RCR Farms' claim that the Seed Population Determination was arbitrary and capricious.

FCIC's reliance on the Best Management Practices for Colorado Corn Guide (the "Colorado Corn Guide") is similarly misplaced. The Colorado Corn Guide specifically states "[t]he best place to get the correct plant population for a given hybrid is from your seed dealer." (Colorado Corn Guide, AR 1439) (emphasis added). Moreover, while the Colorado Corn Guide

8

provides a general 28,000-34,000 seeds per acre recommendation for irrigated growers, it continues to clarify that "[p]lant population is somewhat field-specific and should vary according to other yield impacting factors such as fertility, weed pressure, flex ear ability, irrigation and others." (Colorado Corn Guide, AR 1439). Here, RCR Farms followed the advice of the Colorado Corn Guide—it consulted with its seed dealer, considered field-specific yield factors, and relied on expert analysis from its crop consultant. (*See* Syngenta Seeding Letter, AR 1501; Crop Quest Letter, AR 287; RCR Farms Reconsideration Request Letter, AR 149401499). RMA—in contrast—ignored the Colorado Corn Guide. It refused to consider field-specific yield factors, applied arbitrary recommended seeding rates, and failed to analyze whether RCR Farms followed GFP on a unit-by-unit basis. (GFP Determination, AR 1097-1105).

FCIC also takes issue with RCR Farms pointing out the difference in conditions faced by farmers in Kansas and Bent County, Colorado. FCIC relies on *Noceti v. USDA* on this point, but this reliance is misplaced. In *Noceti*, the producer argued that Mountain House was dissimilar from other areas in the San Joaquin Valley. No. 2:14-cv-01177-KJM-GGH, 2016 WL 304621, at *4 (E.D. Cal. Jan. 26, 2016), *adopted by* 2016 WL 4046978 (E.D. Cal. Mar. 22, 2016). *Noceti* is much different from this case because it was undisputed there that Mountain House was located in the San Joaquin Valley. *Id.* Here, FCIC cannot dispute that Bent County, Colorado, is not located in Kansas. Moreover, to the extent RMA relies on *Noceti* for the proposition that it is not required to individually analyze the 2018 Corn Acres, or the Bent County specific factors that bear on the ideal seeding rate for the 2018 Corn Acres, that proposition stands in stark contrast to both the Kansas Handbook and the Colorado Corn Manual. (Kansas Handbook, AR 1051; Colorado Corn Handbook, AR 1439).

9

Finally, FCIC misunderstands RCR Farms' argument that it was improper to apply arbitrary recommended seeding rates. The problem with RMA's approach is not whether RMA's recommended seeding rates are supported by experts in publications, but whether RMA's dogmatic refusal to deviate from those recommended seeding rates in light of location-specific and field-specific factors applicable to the 2018 Corn Acres. As stated in RCR Farms' Opening Brief, the question in a GFP case is whether the production methods utilized by a producer will allow the crop "to make normal progress toward maturity and <u>produce at least the yield used to determine the production guaranty</u>." (Common Crop Insurance Policy, AR 5). To make this determination, RMA necessarily needed to analyze the specific seeding rates utilized by a producer and analyze whether those seeding rates will allow the crop to produce at least the yield used to determine the production guaranty. However, FCIC's Response Brief makes clear that RMA did not do this. (*See* Response Brief at 28 ("While RMA presumably *could* have hired an expert to opine on RCR Farms' specific seeding rates, RCR Farms points to no requirement . . . that RMA must spend federal funds for such an individualized expert analysis . . . .")). RMA's categorical refusal to perform an individualized analysis is precisely why the GFP Determination is arbitrary and capricious. Instead of analyzing the specific seeding rates used by RCR Farms to determine whether RCR Farms followed GFP, RMA imposed an arbitrary seed population recommendation, untethered from any analysis of what seed population was actually necessary to allow the 2018 Corn Acres to produce at least the yield used to determine RCR Farms production guaranties.

Put simply—RMA chose to ignore a key step in the GFP Determination process when it adopted general recommended seeding rates as a shortcut to determine whether RCR Farms seeding rates were GFP. RMA's refusal to perform an individualized analysis of the actual seed populations planted by RCR Farms was arbitrary and capricious, and must be reversed. To be

clear, reversing this determination will not automatically result in RCR Farms being entitled to an indemnity for its entire 2018 loss claim. Instead, it will simply compel RMA to perform an individualized analysis of the seeding rates planted by RCR Farms on each optional unit to determine whether RCR Farms followed GFP for each optional unit. It is entirely possible that an individualized analysis may result in a new GFP Determination that is adverse to RCR Farms. This is the exact goal of RCR Farms' Petition for Judicial Review—to ensure that RMA follows its regulations, handbook, and guidance documents and issues a proper GFP Determination.

**IV.  RMA's failure to perform an individualized analysis or provide photographs labeled with pertinent information in support of the Weed Control Determination rendered the Weed Control Determination arbitrary and capricious.**

FCIC attempts to justify the Weed Control Determination on the grounds that it did not rely exclusively on the photos taken by RMA adjusters on August 22, 2018. FCIC points to RMA's reliance on the NAU adjuster's observations and photos showing "some weed and grass pressure in most of the fields with some fields having high weed and grass pressure." (Response Brief at 31 (quoting NAU Specialist Report with Exhibits, AR 416)). The mere fact that there was some weed pressure in RCR Farms' fields is not enough to justify the Weed Control Determination. RMA has cited to no authority supporting the proposition that the presence of some weed pressure in a field is proof positive that a producer failed to follow GFP. Some weeds are commonly found in fields. Importantly, the Weed Control Determination was not based on "some weed pressure" in RCR Farms fields. Instead, it was specifically based on "heavy weed pressure." (GFP Determination, AR 1103). If FCIC or RMA would like to revise the GFP Determination so that the Weed Control Determination is based on the presence of "some weed pressure," they are free to retract the GFP Determination and do so. However, for the purposes of this Petition for Judicial

Review, FCIC and RMA are bound by current GFP Determination, which clearly states the Weed Control Determination is based on the presence of heavy weed pressure.

When the analysis is properly focused on the presence of heavy weed pressure on RCR Farms, the problem with the Weed Control Determination is apparent. The NAU adjuster's observations and photos contradict RMA's heavy weed pressure conclusions. The NAU Specialist Report clearly states that heavy weed pressure was only present in <u>some fields</u>. (NAU Specialist Report with Exhibits, AR 416). The NAU adjuster's report is supported by the NAU photographs, which show some weed pressure in many fields and what could be characterized as heavy weed pressure in some fields. Accordingly, FCIC's reliance on the NAU Specialist Report and NAU photographs to support the conclusion that all of RCR Farms' fields had heavy weed pressure is arbitrary and capricious.

FCIC's reliance on the NAU Specialist Report and NAU photographs also illustrates RMA's failure to perform a unit-by-unit analysis in the Weed Control Determination. It appears that FCIC and RMA believe the alleged presence of heavy weed pressure in some fields justifies the determination that RCR Farms failed to follow good weed control methods on all of the fields in the 2018 Corn Acres. The fault in FCIC's logic on this point is obvious. By failing to analyze the Weed Control Determination on a field-by-field or unit-by-unit basis, RMA failed to provide the type of analysis necessary to justify applying the Weed Control Determination to all of the 2018 Corn Acres.

FCIC's Response Brief also misses the mark with respect to the lack of required identifying information with the photographs included in the GFP Determination. RMA's error was not that it did not have that information at hand when it was performing its analysis of the weed control issue. Instead—as is made clear in RCR Farms' Opening Brief—the issue is that RMA failed to

provide that information with the GFP Determination sent to RCR Farms. The GFP Handbook is clear on this point:

> Additionally, the photographic evidence submitted [with the AIP GFP Decision Letter] was not labeled with any pertinent information indicating the date/time taken, unit number location and subject matter depicted. Therefore, the initial AIP GFP Decision Letter to the Policyholder needed to be rescinded.

(GFP Handbook, AR 114). By failing to provide pertinent information with the photographs in the GFP Determination, RMA violated the GFP Handbook. This fact alone justifies the reversal of the Weed Control Determination. Practically speaking, RMA's failure to provide the required information with the photographs impaired RCR Farms' ability to understand and respond to the Weed Control Determination. RCR Farms' ability to understand and contest the Weed Control Determination was further impacted by RMA's failure to provide a detailed, unit-by-unit explanation of the Weed Control Determination. Due to RMA's failure to provide this information or a detailed analysis, RCR Farms was left to guess as to how RMA justified the application of the Weed Control Determination to all of the 2018 Corn Acres.

Also, the mere fact that RCR Farms is familiar with the 2018 Corn acres and knew the dates the photographs were taken did not absolve RMA of its obligation to comply with the GFP Handbook. By the time RCR Farms received the GFP Determination with the unlabeled photographs in May 2019, it was impossible for RCR Farms to conduct its own investigation regarding the weeds depicted in the photographs because the fields depicted in the photographs were no longer in the same condition. Put simply, RMA's refusal to comply with the GFP Handbook and provide pertinent information regarding the NAU photographs prejudiced RCR Farms and denied it the change to meaningfully respond to the Weed Control Determination.

RMA's failure to follow the GFP Handbook not only violates the *Accardi* doctrine, is also denied RCR Farms a meaningful opportunity to respond to the Weed Control Determination. Because RMA failed to provide a detailed, unit-by-unit analysis supporting the Weed Control Determination, or the information required to be provided with its photographic evidence, the Weed Control Determination is arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, RCR Farms respectfully requests that the Court hold as unlawful and set aside RMA's GFP Determination on the grounds that it is arbitrary and capricious, not in accordance with law, without observance of procedure required by law, and unwarranted by the facts.

Respectfully submitted this 11th day of February, 2021.

          *s/Jeff L. Todd*
          Jeff L. Todd
          Jeremiah L. Buettner
          McAfee & Taft A Professional Corporation
          10th Floor, Two Leadership Square
          211 North Robinson
          Oklahoma City, OK 73102-7103
          Telephone: (405) 235-9621
          Facsimile: (405) 235-0439
          Email: jeff.todd@mcafeetaft.com
                  jeremiah.buettner@mcafeetaft.com

          **Attorneys for Petitioner,**
          **RCR Farms, LLC**